David JENKINS and Cindy Jenkins, Individually and on Behalf of all Persons Similarly Situated, Appellants,

v.

ENTERGY CORPORATION, Entergy Services, Inc., Entergy Power Inc., and Entergy Power Marketing Corporation, Appellees.

No. 13–05–035–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

March 2, 2006.

Rehearing Overruled April 7, 2006.

John H. Conway, Washington, DC, Joseph D. Jamail, Frank M. Staggs, Jr., Jamail & Kolius, Micheal D. Sydow, Sydow & McDonald Kaiser & Ahmed LLP, Dymra R. Henderson, Sydow & McDonald, Houston, for appellants.

John F. Williams, David C. Duggins, Clark, Thomas & Winters, Austin, Richard G. Baker, Baker & Zbranek, Liberty, Lawrence L. Germer, Paul A. Scheurich, Beaumont, for appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

This appeal is brought from the trial court's decision not to strike an intervention, and from the order of the trial court dismissing the underlying suit for lack of subject matter jurisdiction. In separate conclusions of law, the trial court found that both the Federal Energy Regulatory Commission ("FERC") and the Texas Public Utilities Commission ("PUC") have exclusive jurisdiction. We affirm in part, reverse in part, and remand.

## I. Background

On August 5, 2003, appellants, David and Cindy Jenkins, individually and on behalf of all persons similarly situated ("Jenkins"), filed a petition alleging that

appellees, Entergy Corporation, Entergy Services, Inc., Entergy Power, Inc., Entergy Power Marketing Corporation, Arkansas Electric Cooperative Corporation,[1] and Entergy Arkansas, Inc. (collectively "Entergy"), had devised an improper price-gouging scheme to sell and deliver higher-priced electrical power to Jenkins, while rejecting and/or selling less expensive power to off-system utilities.

In the petition, Jenkins identifies Entergy Gulf States, Inc. ("EGSI")[2] as an "unnamed co-conspirator," but asserts that it is not an indispensable party: "It [EGSI] is expressly not named as a party defendant, since primary jurisdiction over EGSI lay [sic] with the Public Utilities Commission of Texas."

Entergy Corporation is a public utilities holding company with five subsidiary companies, each of which is a public utility. The Entergy companies include electric power generation, transmission and distribution systems. The five subsidiaries operate in different states throughout the southern United States, providing electrical service to approximately 2.6 million retail customers. EGSI is the operating company serving approximately one million Texas consumers. Each operating company has electric generation facilities, consisting of either nuclear, coal, natural gas, or oil-fired generating plants. Power is shared and distributed under a System Agreement, to which all Entergy companies are parties. The companies also purchase and sell power from each other and from non-affiliates in the wholesale power market. Although each company operates its generation, transmission and distribution facilities independently, the production, purchasing, and sale of wholesale

---

**1.** Arkansas Electric Cooperative Corporation was non-suited on March 26, 2004.

**2.** David and Cindy Jenkins are Texas residents who receive their power through Entergy Gulf States, Inc. ("EGSI").

electricity on behalf of those companies in order to meet needs of retail and wholesale customers are controlled centrally by Entergy Services, Inc. ("ESI"). These decisions are made through a dispatch center located in The Woodlands, Texas. ESI performs a monthly accounting, assigning a portion of the total power resources used by the whole system to each operating company, generating an "intra-system bill."

Jenkins alleges that Entergy and EGSI worked in concert to force excessive purchases of power by EGSI from within the Entergy system, rather than using cheaper power generated by non-Entergy companies, with the result that excessive prices were charged to EGSI customers. Jenkins complains that low-cost power is sold in the wholesale market for a profit, while high-cost power produced by the most inefficient systems is billed to Entergy's and EGSI's Texas customers. Jenkins further alleges that the accounting system was manipulated in an improper and illegal manner, resulting in excessive charges to retail customers between 1994 and 2000 that exceeded prevailing market prices. Jenkins contends that Entergy, through this pattern of theft and conversion, realized substantial illicit profits. Claims include breach of duty and breach of fiduciary duty, aiding and abetting, conspiracy, and violations of the Texas Theft Liability Act.[3] Jenkins seeks damages, including a disgorgement of profits and exemplary damages.

In its original answer, Entergy alleged that Jenkins' claims were preempted by federal law. On September 15, 2003, Entergy removed the matter to federal court, urging federal question jurisdiction. Entergy urged that the terms and conditions of the sharing and allocation of power between the various operating companies were controlled by a tariff, approved by and on file with the Federal Energy Regulatory Commission ("FERC"). Although Jenkins' claims were couched in terms of state torts, Entergy urged that in reality all involved alleged violations of federal law and questions of the reasonableness of the tariff under federal law.

On January 29, 2004, the federal court remanded the matter to the state trial court. The order notes that Jenkins had opted not to plead federal claims and invoked no federal law in his complaint. Therefore, in order to fall within federal question jurisdiction, Entergy, who bore the burden on removal, had to satisfy a three-part test.[4] The federal court concluded that "this case provides no basis for federal jurisdiction since no federal right is an essential element of Plaintiffs' state-law claims." While FERC regulates the wholesale of electricity in interstate commerce, none of Jenkins' claims were dependent upon the violation of a federal tariff. Jenkins could conceivably prove his claims by providing evidence of fraudulent accounting techniques used to overcharge customers. The federal tariff is "not an essential element to any of Plaintiffs' claims," and it "is well settled law that a case cannot be removed on the basis of a federal defense." The federal court determined that, whether or not the Entergy System Agreement governs the behavior of the parties, it provided no basis for

3. TEX. CIV. PRAC. & REM.CODE ANN. § 134.001, *et seq.* (Vernon 2005).

4. *See Howery v. Allstate Ins. Co.*, 243 F.3d 912 (5th Cir.2001). *Howery* holds that federal question jurisdiction can exist where the complaint states a cause of action created by state law and (1) a federal right is an essential element of the state claim, (2) interpretation of the federal right is necessary to resolve the case, and (3) the question of federal law is substantial. *Id.* at 917.

removal jurisdiction. The federal court concluded it had no subject matter jurisdiction in the case.

On April 23, 2004, EGSI filed a petition in intervention, asserting that all of Jenkins' allegations involved prices paid by EGSI to other Entergy defendants and prices paid by EGSI customers for retail electricity. Further, all of the proposed class consisted solely of EGSI customers. EGSI urged that it therefore had a justiciable interest in the suit. That same day, the Entergy defendants (now including EGSI) filed a motion to dismiss for want of jurisdiction, urging that jurisdiction of the trial court was preempted by FERC, and by the Texas Public Utilities Commission ("PUC"), which governs retail rates for power sold to Texas consumers. Entergy pointed out that Jenkins had acknowledged that (1) EGSI's purchases from the Entergy system were based upon FERC "approved rate formulas and tariffs," and (2) EGSI's retail rates and services are subject to the jurisdiction of the PUC.

Jenkins moved to strike the intervention of EGSI, arguing that EGSI was an "interloper," seeking neither to secure affirmative relief nor to defeat any attempt to recover from it. Jenkins urged that EGSI had no justiciable interest in the suit and that, as a joint-tortfeasor, it had no right to intervene for the purpose of defeating a recovery against a named defendant. Following a hearing held June 1, 2004, the trial court issued an order on June 15, 2004, denying the motion to strike the intervention.

Jenkins also opposed Entergy's motion to dismiss, urging that FERC law and regulations did not preempt the state court's jurisdiction. Extensive briefing was provided by both parties; on October 5, 2004, a hearing was held on the motion to dismiss for want of jurisdiction. On November 24, 2004, the trial court entered a "Final Judgment of Dismissal," finding that it lacked subject-matter jurisdiction to proceed. Findings of fact and conclusions of law were entered on December 17, 2004. They reflect the court considered the briefing and argument of the parties, as well as submitted affidavits.[5] The trial court determined there were no contested issues of fact for the court to find. Conclusions of law include the following: (1) Jenkins' causes of action all addressed matters governed by the System Agreement, a tariff filed with and accepted by FERC; (2) asserted damages are the difference between the price paid by Jenkins for electric service from EGSI and the price Jenkins would have paid if available lower-priced power had been allocated to EGSI; (3) under the Federal Power Act, FERC possesses exclusive jurisdiction over federal electric tariffs and court proceedings complaining of actions taken and decisions made under approved federal tariffs are preempted; (4) the amount paid by Jenkins and other retail customers of EGSI for electrical service in Texas is within the exclusive jurisdiction of the Texas PUC; and (5) because the acts and decisions complained of fall within the exclusive jurisdiction of FERC and the relief sought lies within the exclusive jurisdiction of the PUC, the trial court lacks subject matter jurisdiction over the matter.

## II. The Agreement and the Transactions in Issue

The System Agreement is a federal tariff, approved and regulated by FERC. It applies an approved rate structure to reg-

---

**5.** Objections to the affidavits were sustained to the extent that legal conclusions were not considered.

ulate wholesale prices for electric power.[6] The System Agreement networks a system of companies by which the following is accomplished: (1) power generated by each participating company may be exchanged among system participants or sold to outside systems; (2) power may be purchased from off-system entities; and (3) a system operations center is created to (a) determine the most effective scheduling of sources for reliable supply of power and energy on an economical basis, (b) determine availability of energy for purchase from or sale to outside systems, (c) supervise and operate an economic system dispatch center, and (d) determine billing information and conduct accounting functions.[7]

The decisions associated with these aspects of the System Agreement are at the heart of Jenkins' suit. Jenkins does not directly challenge either the rate structure or the FERC-approved formulas that permit recovery of costs by the operating companies participating in the System Agreement. Instead, Jenkins states that he challenges the purchasing decisions by which the costs were incurred in the first place, complaining about allegedly excessive purchases of power from the expensive resources of the Entergy-system pool, rather than from cheaper off-system sources when that power is available.

ESI and/or EPMC dispatches the generating units of the Operating Companies and purchases power from non-affiliates in the wholesale power market in order to meet the energy needs of Defendants'

and EGSI's customers.... ESI and/or EPMC has also sold to off-system buyers ... [manipulating] the processes by which it decides whether to dispatch the System's generating units or purchase power off-system.[8]

Jenkins challenges these decisions because they allegedly resulted in the use of the more expensive power to service EGSI customers, thereby burdening them with higher costs for electrical service.

The System Agreement includes a Schedule MSS–3, which addresses the exchange of electric energy among the companies. Its purpose is to "provide the method of pricing energy exchanged among the Companies." It provides that "energy from the lowest cost source available shall be allocated pursuant to certain priorities;" "energy used to supply others will be provided in accord with rate schedules on file with [FERC]." Energy produced by generating units for system energy requirements are allocated in an explicit priority sequence. Energy received by any company from either its own generation or from some other source can be pooled, distributed from a joint account, and allocated by the central dispatch center to one or more participating companies or to the company generating the power or making the purchase. The System Agreement provides for many of these decisions to be made at the discretion of the operating committee. However, payments for energy supplied and allocated are determined according to express formulas.

**6.** The System Agreement calls for centralized control of electricity purchases, operations, and dispatches throughout the Entergy system, with the overall objective of "economic dispatch," defined to mean obtaining "the lowest reasonable cost of energy to all of the Companies consistent with the requirements of daily operating generation reserve, voltage control, electrical stability, loading of facili-

ties and continuity of service to the customers of each Company."

**7.** This listing does not encompass all functions of the System Agreement.

**8.** *See* Plaintiffs' First Amended Original Petition.

### III. Issues on Appeal

Jenkins raises four issues on appeal to determine whether (1) the PUC has exclusive or primary jurisdiction over the matter, (2) FERC has exclusive, preemptive jurisdiction over the matter, (3) the trial court erred in dismissing the matter for lack of subject matter jurisdiction, and (4) the trial court erred in failing to strike the intervention of EGSI. The issues, as framed, directly challenge each of the conclusions of law of the trial court.

### IV. Standard of Review

■ Jenkins' first three issues challenge the trial court's conclusions that it lacked subject matter jurisdiction over the suit. Primary jurisdiction questions are questions of law. *Subaru of Am. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222 (Tex.2002) (citing *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 19 (Tex.2000)). Determining if an agency has exclusive jurisdiction requires statutory construction and raises jurisdictional issues. *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004); *Subaru*, 84 S.W.3d at 222. Thus, whether an agency has exclusive jurisdiction is a question of law we review de novo. *Subaru*, 84 S.W.3d at 222 (citing *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex.1999); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998)).

■ The plaintiff bears the burden of alleging facts affirmatively demonstrating the trial court's jurisdiction to hear a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993); *Mission Consol. Indep. Sch. Dist. v. Flores*, 39 S.W.3d 674, 676 (Tex.App.-Corpus Christi 2001, no pet.). A trial court must not weigh the merits of the case, but instead consider only the pleadings and evidence pertinent to the jurisdictional question. *County of Cameron v. Brown*, 80 S.W.3d 549, 554–55 (Tex.2002) (citing *Tex. Natural Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex.2001)). In doing so, the trial court must construe the plaintiff's pleadings liberally in favor of jurisdiction, *Peek v. Equip. Serv. Co.*, 779 S.W.2d 802, 804 (Tex.1989), and must take all factual allegations pled as true, unless the defendant pleads and proves that the allegations were fraudulently made in order to confer jurisdiction. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 449 (Tex.1996). On appeal, we similarly consider the facts alleged by the plaintiff and, to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties. *White*, 46 S.W.3d at 868. We must construe the pleadings in the plaintiff's favor and look to the pleader's intent. *Brown*, 80 S.W.3d at 554–55. Our task is not to determine the merits of the case but rather to examine the petition, taking as true the facts pled, and determine whether those facts support jurisdiction in the trial court. *Baston v. City of Port Isabel*, 49 S.W.3d 425, 427–28 (Tex.App.-Corpus Christi 2001, pet. denied).

■ With respect to Jenkins' fourth issue, we review a trial court's determination as to whether an intervention should be stricken for abuse of discretion. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex.1996); *Guar. Fed. Savs. Bank. v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex.1985). The exercise of discretion is within the sole province of the trial court, and an appellate court may not substitute its discretion for that of the trial judge. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex.1985) (orig.proceeding). Rather, an abuse of dis-

cretion occurs only when the trial court reaches a decision that is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* at 917.

## V. Analysis

### A. The Role of EGSI in the Suit

Jenkins contends that EGSI was deliberately not named as a defendant in the underlying suit because primary jurisdiction over EGSI lies with the PUC. Jenkins further contends that the prudence of EGSI's actions was not before the court, as the claims were articulated in Jenkins' pleadings. Instead, Jenkins characterizes EGSI as an "interloper," who intervened solely to complicate the jurisdictional issues in the case.

However, this argument is problematic. Although the Entergy company ESI centrally controls allocation and discretionary decisions, operates the dispatch center in The Woodlands, Texas, and prepares the monthly accountings, it is not the sole object of Jenkins' petition. Jenkins' pleadings in fact include accusations that Entergy (including ESI) and EGSI acted in concert, in a conspiracy:

> ESI, under the direction of or with the knowledge and/or consent of the other Defendants and EGSI, has manipulated the processes by which it decides whether to dispatch the System's generating units or purchase power off-system.... Defendants and EGSI, directly and/or indirectly, have actively participated with the other Defendants and EGSI in one or more improper and illegal schemes.... Defendants' and EGSI's after-the-fact accounting methods and computer programs have hidden and encouraged the improper purchasing decisions.... Defendants and EGSI have worked in concert in

> implementing the methods ... Defendants and EGSI, directly and/or indirectly, charged customers 22% more than the prevailing market prices ... [generating] vast and illegal revenues for Defendants' and EGSI's Entergy affiliates.... [9]

Defendants and EGSI are alleged to have jointly charged Jenkins for power secured at a higher cost than was obtainable on wholesale markets, intentionally or negligently failed to procure readily available supplies of electric power from non-affiliates, and converted profits realized for Entergy's and EGSI's use and benefit. EGSI is directly alleged to have participated in the same wrongdoing as the other named defendants; it is simply not named in the suit.

We conclude, from reading Jenkins' petition, that Jenkins' petition complains of wrongdoing by both Entergy and EGSI. Rather than being peripheral, EGSI is alleged to have been a full partner, co-conspirator, and co-tortfeasor in what is termed the illegal scheme. We therefore conclude that the prudence of EGSI's actions was in fact directly before the trial court by virtue of Jenkins' pleadings.

### B. The Intervention

EGSI, not named as a party defendant, chose to intervene in the suit pursuant to rule 60 of the rules of civil procedure. Tex.R. Civ. P. 60. A person or entity has the right to intervene if it could have brought the same action, or any part thereof, in his own name, or, if the action had been brought against him he would be able to defeat recovery, or some part thereof. *Guar. Fed. Savs. Bank,* 793 S.W.2d at 657. No permission is required to intervene; the party opposing the intervention has the burden to challenge it by a

---

9. *See* Plaintiffs' First Amended Original Petition.

motion to strike. *Id.* While the trial court has broad discretion to determine whether the intervention should be stricken, it is an abuse of discretion to strike a plea in intervention if (1) the intervenor meets the above test, (2) the intervention will not complicate the case by an excessive multiplication of the issues, and (3) the intervention is almost essential to effectively protect the intervenor's interest. *Id.*

 A party seeking to intervene must show a legal or equitable interest such that he would be entitled to recover in his own name to the extent of relief sought, or, if he were the original defendant, he would be able to defeat recovery in part or in whole. *Rogers v. Searle*, 533 S.W.2d 440, 442 (Tex.Civ.App.-Corpus Christi 1976, no writ). While that interest must be greater than a mere contingent or remote interest, a party "has a justiciable interest in a lawsuit, and thus a right to intervene, when his interests will be affected by the litigation." *Jabri v. Alsayyed*, 145 S.W.3d 660, 672 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Intermarque Auto. Prods., Inc. v. Feldman*, 21 S.W.3d 544, 549 (Tex.App.-Texarkana 2000, no pet.). Even where an intervenor has not or could not have been sued directly, if a judgment for the plaintiff may lead to an action against the intervenor or otherwise seriously prejudice the intervenor, the intervention is necessary to assure a proper defense against the claim. *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 234 (Tex.App.-Texarkana 1998, no pet.). The party "must have such interest in the subject matter of litigation as makes it necessary or proper for him to come in to the case for the preservation of that right." *Id.*

 Jenkins contends that, as an alleged joint tort-feasor, EGSI had no right to intervene. However, one of Jenkins' claims alleged that EGSI was an integral part of a conspiracy scheme, actively conceiving or condoning wrongful practices and directly participating in and profiting from the alleged wrongs perpetrated on customers of EGSI. While many parties are named as defendants, the fact that EGSI is alleged to have participated in a conspiracy and to have converted ill-gotten monies for its own direct use and benefit means that EGSI could potentially defeat recovery under that claim, in whole or in part.[10] We conclude that EGSI, an unnamed defendant, had a justiciable interest in the suit. We further conclude that the nature of the alleged wrongdoing by all named defendants is inextricably interwoven with the alleged wrongdoing of EGSI, deriving from the same allegations, and that EGSI's participation in the suit will not unduly complicate the case by a multiplication of issues. Finally, EGSI's intervention is essential to effectively protect some right or interest of EGSI. *See Guar. Fed. Savs. Bank*, 793 S.W.2d at 657. EGSI's interests are potentially adversely affected by the litigation in the event of a judgment for Jenkins. *Jabri*, 145 S.W.3d at 672; *Intermarque*, 21 S.W.3d at 549;

**10.** Elements of a conspiracy claim include (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex.2005) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996)). If other defendants are able to prove they did not participate in a conspiracy, and EGSI is similarly able to defeat any claim that it participated, no claim for conspiracy can survive. Further, failure to include EGSI could potentially adversely impact EGSI by making it impossible for its parent or affiliate to defeat such a conspiracy claim, resulting in an indirect, if not direct, impact upon EGSI's operations and revenues.

*Evan's World Travel,* 978 S.W.2d at 235. It is undisputed that the Entergy family of companies, including EGSI, makes purchasing, sales, and allocation decisions centrally for the set of companies as a whole. Any ruling in favor of Jenkins therefore will indirectly, if not directly, impact interests and operations of EGSI; this is further particularly true because the members of the putative class are all direct retail customers of EGSI.

We conclude that the trial court did not abuse its discretion in refusing to strike the intervention of EGSI. We overrule Jenkins' fourth issue on appeal.

### C. The Role of the PUC and the Statutory Scheme

■■■ The PUC is charged with protecting the public interest in the rates and services of electric utilities, to establish a comprehensive and adequate regulatory system for those utilities to assure just and reasonable "rates, operations, and services." TEX. CONST. art. V, § 8; TEX. UTIL. CODE ANN. §§ 31.001, 32.001 (Vernon 1998). The PUC's jurisdiction is admittedly broad, extending to issues involving the rates, operations, and services of an electric utility.

[T]he statutory description of PURA[11] as "comprehensive" demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas. That is, PURA is intended to serve as a "pervasive regula-

tory scheme" of the kind contemplated in *David McDavid Nissan.*[12]

\* \* \*

The Legislature's language demonstrates that it intended PURA to be the exclusive means of regulating electric utilities in Texas. The Legislature's description of PURA as "comprehensive," coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness.

*In re Entergy Corp.,* 142 S.W.3d 316, 322–23 (Tex.2004) (citations omitted).[13]

The PUC may allow for recovery of the reasonable costs of purchased power. *See* TEX. UTIL CODE ANN. §§ 36.203 (Vernon 1998), 36.204 (Vernon Supp.2005), 36.205 (Vernon 1998). In establishing and regulating retail rates, the PUC is not precluded from reviewing and providing adjustments for a utility's "fuel factor." *See* 16 TEX. ADMIN. CODE §§ 25.236–237 (Tex.2005). These provisions govern the amount of dollars in expenses that a utility may recover from its retail customers.

### D. The Question of Exclusive Jurisdiction of the PUC

The parties do not dispute that the commission has exclusive jurisdiction over rate structures, including fuel factors. Jenkins contends that he does not challenge any rate structure for electrical power or any other orders of the PUC, and that the reasonableness of the fuel

---

**11.** Public Utility Regulatory Act, TEX. UTIL CODE ANN. § 11.001 *et seq.* (Vernon 1998).

**12.** *Subaru of Am. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 221 (Tex.2002).

**13.** *In re Entergy* involved an alleged breach of a merger agreement. That court determined that even if the merger agreement began as a private contract, it took on an administrative

character when the parties agreed that the merger savings would be implemented in the post-merger rate proceedings filed with the PUC, and the agreement was the basis for the PUC's regulatory approval of the merger. Therefore the PUC had exclusive jurisdiction over the dispute. *See In re Entergy Corp.,* 142 S.W.3d 316, 322–23 (Tex.2004). That dispute is admittedly distinguishable from the situation before us.

and purchase power costs are not in issue. Jenkins instead challenges decisions to either purchase, use or sell lower-priced and higher-priced energy, not the monies or rates involved in those purchases. Jenkins argues that he challenges decisions relating to wholesale transactions, made at interstate levels that are beyond the jurisdiction of the PUC. Jenkins further contends that, while the PUC retains authority to review and evaluate EGSI's purchasing decisions, EGSI was not named as a defendant and the prudence of its actions was not before the trial court in Jenkins' pleadings.

We have already determined that EGSI could properly intervene in the suit and that the prudence of its actions were before the trial court. We further note that all putative class members are retail customers of EGSI.

### 1. Wholesale Rates and Interstate Commerce

Jenkins contends the challenged decisions lie beyond the jurisdiction of the PUC, involving matters of interstate commerce. The Entergy system cuts across several state lines, and involves transactions between multiple jurisdictions, in interstate commerce:

> [The Entergy Operating Companies] approach power planning on a systemwide basis, whereby the individual companies' needs are the component parts of the system's power plan [and] implementation of the System plan ... require[s] that the individual companies' needs be subsumed by the greater interests of the entire System.

*Miss. Power & Light Co. v. Miss.*, 487 U.S. 354, 376, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).

A state utility regulatory commission has the jurisdiction to regulate all in-state sales of the utility to consumers. *See Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 394–95, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (holding states have an interest in regulating retail sales). However, the line under the Federal Power Act is clear, cutting "sharply and cleanly between sales for resale and direct sales for consumptive uses." *Id.* at 380, 103 S.Ct. 1905 (concluding that a utility receiving some of its power from out-of-state is subject to federal and not state regulation in its sales of electricity to a municipality that resold the bulk of the power to others).[14] Clearly, wholesale rates are subject exclusively to federal regulation. *Id.* at 380, 103 S.Ct. 1905. "FERC has exclusive authority to determine the reasonableness of wholesale rates." *Miss. Power & Light*, 487 U.S. at 371, 108 S.Ct. 2428. States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair. *Id.*

"FERC-mandated allocations of power are similarly binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates." *Id.*

> States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair.... When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over re-

---

**14.** Citing *Panhandle E. Pipeline Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 517, 68 S.Ct. 190, 92 L.Ed. 128 (1947); *United States v. Pub. Utils. Comm'n of Calif.*, 345 U.S. 295, 308, 73 S.Ct. 706, 97 L.Ed. 1020 (1953); *FPC v. S. Calif. Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964) (applying test set forth in *Attleboro Steam & Elec. Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927)).

tail sales to prevent the wholesaler-asseller from recovering the costs of paying the FERC-approved rate.

*Id.* at 371–72, 108 S.Ct. 2428.

 Nor may states review "the prudence of a purchaser's participation in an integrated operating arrangement involving wholesale and retail transmissions between pool members." *Gulf States Utils. Co. v. Pub. Utils. Comm'n,* 841 S.W.2d 459, 467 (Tex.App.-Austin 1992, writ denied). However, this is not a rate case; this dispute instead deals with the decisions at a wholesale, inter-state level to use either system-generated higher-cost energy or lower-cost, off-system-generated purchased power.

### 2. Exclusive Jurisdiction as opposed to Primary Jurisdiction

 Jenkins also urges that jurisdiction of the PUC will not attach because the remedy sought is not available through the PUC. This is a question of primary jurisdiction, which operates to allocate power between courts and agencies when both have authority to make initial determinations in a dispute. *Subaru,* 84 S.W.3d at 221. Texas courts have in the past confused the primary jurisdiction and exclusive jurisdiction doctrines, which are distinctly different and have different consequences when applied. *Id.* at 220. Despite similar terminology, primary jurisdiction is prudential whereas exclusive jurisdiction is jurisdictional. *Id.* (citing *Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 842 (Tex. App.-Houston [1st Dist.] 1990, writ denied)). Trial courts should allow an administrative agency to initially decide an issue when (1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview, and (2) great benefit is derived from an agency's uniform interpretation of its laws, rules, and regulations.

 When an action is inherently judicial in nature, the courts will retain jurisdiction to determine the controversy *unless* the legislature by valid statute has expressly granted exclusive jurisdiction to the administrative body. *Amarillo Oil Co. v. Energy–Agri Products, Inc.,* 794 S.W.2d 20, 26 (Tex.1990) (concluding that a suit to enjoin trespass by "sand fracking" could proceed in a judicial forum); *see also Foree v. Crown Petroleum Corp.,* 431 S.W.2d 312, 316 (Tex.1968) (finding that courts have jurisdiction when the commission in issue is powerless to grant the relief sought). Absent such an exclusive grant, inherently judicial matters (such as a suit for damages under the Deceptive Trade Practices Act) remain within the jurisdiction of the courts. *Southwestern Bell Tel. Co. v. Nash,* 586 S.W.2d 647, 649–50 (Tex. Civ.App.-Austin 1979, no writ). Further, where the administrative agency is powerless to grant the relief sought and has no authority to make incidental findings which are essential to the granting of the relief, the doctrine does not apply. *Id.* While the Legislature has conferred exclusive original jurisdiction upon the Public Utilities Commission over the business and property of utilities in this state for the purpose of regulating rates, operations, and services,

> ... we hold that jurisdiction over this tort claim against a telephone company has not been thus removed from the courts. Where the claim is not for future compliance but for damages based on past acts, the exhaustion of administrative remedies doctrine may not apply. The notion is based on the absence of a statute authorizing the Public Utility Commission to fix or adjudicate claims for damages.

*Id.* at 650; *see also Henderson v. Cent. Power & Light,* 977 S.W.2d 439, 447 (Tex. App.-Corpus Christi 1998, writ denied) (holding a cause of action for DTPA violations was not abrogated by the tariff, the document listing a public utility's services and the rates for those services); *Dolenz v. Southwestern Bell Tel. Co.,* 730 S.W.2d 44, 45 (Tex.App.-Houston [14th Dist.] 1987, no writ) (holding that jurisdiction over tort claims against a telephone company has not been removed from the courts).

### 3. Conclusion as to PUC

With respect to Jenkins' first issue, we conclude that the PUC does not have exclusive jurisdiction over this matter. The retail rate structure is not the object of Jenkins' pleadings, and the PUC cannot consider purchasing, selling or allocation decisions involving wholesale power sales where those decisions are made on an interstate basis between various companies. The federal power act, by limiting federal regulation of transmitting electric energy in interstate commerce to those matters which are not subject to regulation by states, does not preserve "exclusive state regulation of wholesale hydroelectric sales across state borders." *See United States v. Pub. Utils. Comm'n,* 345 U.S. 295, 310, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (citing 16 U.S.C. § 824(a)). State power does not extend to an interstate sale "in wholesale quantities, not to consumers, but to distributing companies for resale to consumers." *Id.* at 303, 73 S.Ct. 706 (citing *Pub. Utils. Comm'n v. Attleboro Steam & Elec. Co.,* 273 U.S. 83, 89, 47 S.Ct. 294, 71 L.Ed. 549 (1927)).

Additionally, the suit before us is inherently judicial in nature, in which Jenkins brings state law tort claims based on those interstate purchasing and allocation decisions. We therefore conclude that the jurisdiction of the PUC is not primary in this instance. We sustain Jenkins' first issue on appeal.

### E. FERC Jurisdiction and Preemption

The trial court below also determined that FERC has exclusive jurisdiction over the matters complained of in this suit. There is no dispute that FERC governs the Entergy System Agreement, the federal tariff pursuant to which the challenged decisions are made. Indeed, Jenkins concedes that the matters in issue fall within potential FERC jurisdiction, but not within its exclusive jurisdiction. Entergy contends FERC jurisdiction is exclusive, despite the federal court's order of remand.[15]

### 1. The Reach of FERC's Exclusive Jurisdiction

Congress chose to regulate the interstate sale of electricity through the wholesale rates that utility companies are permitted to charge. *See* 16 U.S.C. §§ 824, 824d; *Official Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co.,* 378 F.3d 511, 518 (5th Cir.2004). Although utility companies determine electricity rates through private contract negotiations, those rates must be filed with FERC and certified as "just and reasonable" to be lawful under the Federal Power Act. 16 U.S.C. § 824d(a), (c); *Potomac,* 378 F.3d at 518. FERC has the "exclusive authority to determine the reasonableness of wholesale [electricity] rates" under the Federal Power Act. *Potomac,* 378 F.3d at 518 (citing *Miss. Power & Light,* 487 U.S. at 371, 108 S.Ct. 2428). That authority led to the development of the filed rate doctrine, which states that a

---

**15.** The federal court, in declining jurisdiction, noted: "Even if they could have, Plaintiffs do not allege a violation of the Federal Power Act or any other federal law or regulation. Nor are they attempting to enforce a liability or duty under the Act."

utility's "right to a reasonable rate [under the Federal Power Act] is the right to the rate which the Commission files or fixes, and, ... except for review of the Commission's orders, [a] court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.* (quoting *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 963–64, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986)).

 Under the filed rate doctrine, "the reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Miss. Power & Light,* 487 U.S. at 375, 108 S.Ct. 2428. Consistent with that position, the Supreme Court has held that district courts are preempted from awarding breach of contract damage awards calculated using a rate other than the rate filed with FERC. *Potomac;* 378 F.3d at 519 (citing *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 584–85, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)).

 Many aspects of the interstate "transmission" or "sale" of wholesale energy pursuant to a federal tariff, and not merely matters involving rates, fall within FERC's exclusive jurisdiction. *See Calif. ex rel. Lockyer v. Dynegy,* 375 F.3d 831, 851 (9th Cir.2004). There is a bright-line distinction between wholesale sales, which fall within FERC's plenary jurisdiction, and retail sales, over which the states exercise jurisdiction. *Id.* Moreover, the filed rate doctrine is not limited "to rates per se or FERC orders that deal in terms of prices or volumes or purchases." *Id.* (citing *Duke Energy Trading & Mktg.,*

*L.L.C. v. Davis,* 267 F.3d 1042, 1056 (9th Cir.2001); *Nantahala,* 476 U.S. at 966, 106 S.Ct. 2349). However, *Lockyer* is distinguishable in that it involved direct allegations that companies had failed to adhere to their tariff obligations to provide reserve energy capacity, thereby rendering the Independent System Operator[16] incapable of maintaining the grid's stability by maintaining supply and demand. Thus, those allegations went "directly to wholesale market activities" and compliance with FERC tariff obligations; the fact that they were couched in terms of state law claims did not defeat FERC's preemptive jurisdiction. *Id.* at 852.

Similarly, in another case relied upon by Entergy, *In re Calif. Wholesale Elec. Antitrust Litigation,* 244 F.Supp.2d 1072, 1080 (S.D.Cal.2003), *aff'd subnom. Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mktg., Inc.,* 384 F.3d 756 (9th Cir.2004), although claims were lodged in terms of state antitrust and unfair competition laws based upon alleged conduct in artificially inflating the price of electricity, FERC jurisdiction preempted the suit because the rates and violations of the tariffs were directly challenged.

> Plaintiff further alleges that it has been "forced to pay prices for electricity in excess of rates that would have been achieved by a competitive market" ... [with the result of] wholesale energy being sold at prices that far exceed the price which energy would be sold in a truly competitive market. In relation to Plaintiffs['] UCL claim, it alleges defendants never filed their rates ... the result of which deprived the public ... of notice and information necessary to make informed decisions about rates.

**16.** The "Independent System Operator" was defined as a non-profit, non-governmental public benefit corporation, set up to orches-

trate the transmission and sale of electricity. *Calif. ex rel. Lockyer v. Dynegy,* 375 F.3d 831, 852 (9th Cir.2004).

*Id.* at 1075. The court concluded that it, along with other state or federal courts, was "prohibited from considering any rate other than that filed with FERC to be the appropriate wholesale rate. As such, the filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue." *Id.* at 1077 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 488 (8th Cir.1992)).

■ However, *Gulf States Utils. Co. v. Ala. Power Co.,* 824 F.2d 1465, 1471–74 (5th Cir.1987), concludes that courts are not preempted from awarding breach of contract damages based upon a theory that the breach increased the amount that was purchased, so long as damages are calculated using the filed rate. *Gulf States,* 824 F.2d at 1472. Courts may similarly set aside an energy contract obtained unconscionably or by fraud without interfering with FERC's rulemaking power, so long as that order is not based upon a theory that the filed rate was too high. *Id.* While *Gulf States* recognized that setting aside a contract "would affect the filed rates by eliminating them," it held that the Federal Power Act does not preempt such indirect effects. *Id.* at 1472 n. 9.

Whether FERC has exclusive jurisdiction under the Federal Power Act is therefore a close question dependent upon what exactly is in issue. Here, Jenkins does not bring a breach of contract claim; he does not allege fraud. Instead, he brings claims related to implementation of the System Agreement, the purchases and sale of power under it, and the prudence of those or other discretionary decisions that allegedly burden EGSI customers with higher-priced power, albeit at regulatory-approved rates. Jenkins asserts that the "choice not to purchase lower-cost power available from non-affiliates falls to the discretion of the Operating Companies," and that not all discretionary decisions are subject to FERC's exclusive jurisdiction.

## 2. Discretionary Decisions

■ It is clear that FERC jurisdiction is not exclusive or preemptive in all circumstances. *See* FERC Order No. 888–B, 81 F.E.R.C. ¶ 61,248 at 62,081, 1997 WL 833250 (1997) ("[I]t is likewise clear that the Commission's jurisdiction to consider disputes arising under jurisdictional tariffs does not as a matter of law preclude state courts from also entertaining such disputes in the appropriate circumstances."). Such decisions are guided by *Ark. La. Gas Co. v. Hall,* 7 F.E.R.C. ¶ 61,175 at 61,321, 0079 WL 167678 (1979), in which FERC stated that its assertion of jurisdiction depends upon three factors: (1) whether FERC has some special expertise that would make it the appropriate forum, (2) whether there is a need for uniformity in interpretation of the type of questions raised, and (3) whether the case is important in relation to the regulatory responsibilities of FERC. *Id.* at 61,322. In *Hall,* FERC determined that it had no special expertise in deciding non-technical questions, that there was no need for uniformity in interpreting terms defined by individual contracts, and that the matter did not impact FERC regulatory responsibilities. *Id.* at 61,323. FERC had no reason to preempt jurisdiction of the Louisiana court.

In *Entergy La., Inc. v. La. Pub. Serv. Comm'n,* 539 U.S. 39, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003), the United States Supreme Court took under consideration the System Agreement involving the same family of companies as involved in this matter. That decision focuses on whether challenges could be raised to allocations of costs relating to non-operating generation units, and involved application of Schedule

MSS–1 to the System Agreement. *Id.* at 41, 123 S.Ct. 2050.

 The court in *Entergy La.* determined that "[w]here, as here, public utilities share capacity, the allocation of costs of maintaining capacity and generating power constitutes the sale of electric energy at wholesale in interstate commerce." *Id.*

> The filed rate doctrine requires that interstate power rates filed with FERC or fixed by FERC must be given binding effect.... In *Nantahala* and *MP & L,* the Court applied the filed rate doctrine to hold that FERC-mandated cost allocations could not be second guessed by state regulators.[17]

. . .

The amended system agreement differs from the tariffs in *MP & L* and *Nantahala* because it leaves the classification of ERS units to the discretion of the operating committee, whereas in *Nantahala* and *MP & L* the cost allocations were specific mandates. The Louisiana Supreme Court concluded that this delegated discretion provided room for the LPSC's finding of imprudence. However, ... [w]e see no reason to create an exception to the filed rate doctrine for tariffs of this type that would substantially limit FERC's flexibility in approving cost allocation arrangements. It matters not whether FERC has spoken to the precise classification of ERS units, but only whether the FERC tariff dictates how and by whom that classification should be made. Because the amended system agreement clearly does so, ... second-guessing of the classification here is pre-empted.

*Id.* at 49–50, 123 S.Ct. 2050.

 Clearly, FERC-mandated allocations cannot be challenged except before FERC, and neither can discretionary decisions that would impact or impair FERC's flexibility in approving cost-allocation arrangements. The court therefore found the Louisiana Public Service Commission could not challenge as imprudent certain decisions made pursuant to the Entergy System Agreement, even though they fell within the limited discretion of the operating committee. *Id.* at 49, 123 S.Ct. 2050.

 In *Gulf States,* 824 F.2d at 1471, however, questions arose relating to the *amounts* of power purchased, with the court determining that decisions relating to quantities or amounts of power purchased are not preempted by the Federal Power Act. "While the FERC has exclusive [jurisdiction] over rates, it does not have jurisdiction over quantities except as quantities may affect rates." *Id.* Similarly, FERC has noted with respect to its own jurisdiction:

> [Atlantic City Electric Company], the [Public Advocate of New Jersey] and the [New Jersey Board of Public Utilities] ... argue that the Commission did not consider the Board's findings that the Susquehanna power was unneeded and that the purchase was uneconomic.... [They] do not argue that PP & L's rates are excessive, but that the purchase is uneconomic from [Atlantic City Electric Company's] point of view. *We do not*

---

**17.** The state order in *Nantahala* allocated more of Nantahala's purchases to low-cost power than the proportion approved by FERC. By requiring Nantahala to calculate its rates as if it needed to procure less high-cost power than under FERC's order, the state order "trapped" a portion of the costs incurred by Nantahala and ran counter to the rationale for FERC approval of cost allocations. *Entergy La., Inc. v. La. Pub. Serv. Comm'n,* 539 U.S. 39, 47, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003) (citing *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 971, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986)).

*view our responsibilities under the Federal Power Act as including a determination that the purchaser has purchased wisely or has made the best deal available.*

*Pa. Power and Light Co.*, 23 F.E.R.C. ¶ 61,325 at 61,716, 1983 WL 39648 (1983) (emphasis added). "[FERC] has consistently recognized that wholesale ratemaking does not, as a general matter, determine whether a purchaser has prudently chosen from among available supply options." *Cent. Vt. Pub. Serv. Corp.*, 84 F.E.R.C. ¶ 61,194 at 61,975, 1998 WL 765497 (1998) (citing *Pa. Power and Light Co.*, 23 F.E.R.C. ¶ 61,325 at 61,716, 1983 WL 39648). That is exactly what appears to be in issue here.

Entergy urges, nevertheless, that the purchases and allotments challenged by Jenkins, involving transactions between the companies that are parties to the System Agreement, necessarily involve FERC *mandated* purchases. We have already acknowledged that if a purchaser has no legal right to refuse to buy that power, or no legal choice but to make a particular purchase, FERC jurisdiction will apply. *See Cent. Vt. Pub. Serv. Corp.*, 84 F.E.R.C. ¶ 61,194 at 61,975, 1998 WL 765497. Entergy relies on *Middle South Energy, Inc.*,[18] 31 F.E.R.C. ¶ 61,305 at 61,661, 0085 WL 547104 (1985), for the proposition that EGSI's purchases are mandatory. That decision found no incentive structure existed between the parties to the System Agreement because "the interchange transactions are wholly within the integrated System, are centrally dispatched, and are mandated by MSS [Entergy] rather than the individual companies." *Id.* However, the agreement reflects those interchange transactions are not mandated

by FERC, but instead are delegated to the operating committee, to which the participating companies must defer. Therefore, these decisions are not "legally mandated" as contemplated by *Miss. Power & Light*, 487 U.S. at 371, 108 S.Ct. 2428, or *Entergy La.*, 539 U.S. at 49–50, 123 S.Ct. 2050. We interpret the discretionary decisions in issue as being the type that do not impact or impair FERC's flexibility in approving cost-allocation arrangements. *Cf. Entergy La.*, 539 U.S. at 41, 123 S.Ct. 2050.

### 3. The Question of Damages

Entergy argues that Jenkins' damage claims place this matter within FERC's exclusive jurisdiction. Jenkins prays for the "difference between the true price for power that should have been charged Plaintiffs and the actual price charge to Plaintiffs for the Entergy System Pool power," or alternatively for a disgorgement of "ill-gotten gains and profits earned."

■ We agree that the filed rate doctrine bars a claim that would require this Court to measure the difference between the allegedly fixed wholesale price and an otherwise "just and reasonable wholesale price," regardless of whether the claim itself is couched in state law terms. *Calif. Wholesale Elec.*, 244 F.Supp.2d at 1078. We nevertheless conclude that this is not the measure of damage pursued by Jenkins. *Cent. Vt. Pub. Serv. Corp.*, 84 F.E.R.C. ¶ 61,194 at 61,975, 1998 WL 765497, involved FERC's acceptance of its annual cost report filing under its RS–2 wholesale rate schedule with Connecticut Valley Electric Company. FERC specifically made no determination as to whether it was prudent for the purchaser to enter

---

**18.** The Enetergy system of companies was formerly identified as Middle South Utilities, and cases involving Middle South Energy or related entities involve the same (or predecessor) system agreement in issue here.

into a contract, or whether, over time, it had become imprudent for the purchaser not to exercise termination rights in order to purchase cheaper power elsewhere. *Id.* FERC took no position on whether Connecticut Valley had other power supply choices available, or whether it acted imprudently. *Id.*

Jenkins does not challenge the rate structure by which claimed damages would be calculated. He accepts the rates for all electricity, however acquired. Jenkins does not allege any textual violations of the System Agreement, or breach of contract. Jenkins does not challenge the rates or the FERC-approved formulas, but instead the discretionary decisions that directed who would benefit from the cheaper power. *Cf. La. Pub. Serv. Comm. v. Entergy Servs.,* 106 F.E.R.C. ¶ 63,012 at 65,104, 2004 WL 226594 (2004)[19] (involving direct challenges to the System Agreement's cost allocation formulas and alternative claims that the System Agreement had been violated).

There is a distinction between Jenkins' allegations and cases such as *Calif. Wholesale Elec.,* where the plaintiffs asserted that absent the power companies' improper conduct and anti-competitive acts, they would have paid different "rates." *Calif. Wholesale Elec.,* 244 F.Supp.2d at 1080. The plaintiffs in *Calif. Wholesale Elec.* sought as redress the difference between the charged rates and the different, hypothetical rates they believed would have "been achieved in a competitive market." *Id.* at 1077. Because the court would be "expressly required to assume 'a hypothetical rate different from that actually set by FERC,'" FERC jurisdiction prevailed. *Id.* Such is not the case here.

#### 4. The System Agreement

We have also reviewed the portions of the System Agreement cited by Entergy for the proposition that the agreement controls the prudence of purchases of power by the operating committee, and therefore FERC jurisdiction is exclusive. The cited portions of the agreement reflect the following: (1) the companies, with the consent of or under conditions specified by the operating committee, may agree to purchase capacity or energy from outside sources and if purchased by the operating company, shall be allocated amongst the companies in any manner mutually agreeable to them; (2) the operating committee may purchase energy under economic dispatch or emergency conditions; (3) the operating committee is to ensure the continuous supply or capacity of energy, provide for and coordinate safe dispatching, the proper distribution of reserves, coordinate negotiations for the interchange and sale of power and energy, including the sale and delivery to others on a profitable basis of power and energy not required for system purposes, and to secure power from external sources as may be required or will result in savings to the companies; and (4) the operating committee shall determine availability of energy for purchase from or sale to outside systems in an economical manner.

The discretion reflected in these provisions is broad. The fact that the operating committee has such discretion granted in the System Agreement does not mandate that FERC oversee each of these decisions. Indeed, FERC has specifically declined to consider the prudency or wisdom of a purchaser's choices between available power supply options, or whether a purchaser "has made the best deal available." *Pa. Power and Light Co.,* 23 F.E.R.C. ¶ 61,325 at 61,716, 1983 WL 39648; *Cent. Vt. Pub. Serv. Corp.,* 84 F.E.R.C. ¶ 61,194

---

**19.** *Aff'd in part and rev'd in part,* 111 F.E.R.C.

¶ 61,311 at 62,350, 2005 WL 1301766 (2005).

at 61,975, 1998 WL 765497 (citing *Pa. Power and Light Co.*, 23 F.E.R.C. ¶ 61,325 at 61,716, 1983 WL 39648).[20]

We further note the observations of the federal court in its order remanding the case before us to state court:

> None of the Texas common law or statutory causes of action cited by Plaintiffs in their Petition require the violation of a federal tariff. Conduct that violates the tariff may also violate the TTLA [Texas Theft Liability Act] or other common-law duties, but a violation of the tariff is not an essential element to any of Plaintiffs' claims. Plaintiffs can conceivably prove their state-law claims by providing evidence that Defendants used fraudulent accounting techniques to overcharge customers. This type of case would not require Plaintiffs to reference the tariff during the presentation of their case. This is not to say the tariff would never be mentioned in a trial of this controversy ... but the fact remains that the federal tariff at issue is not an essential element to any of Plaintiffs' claims.[21]

We conclude that, while FERC jurisdiction could potentially expand to encompass this dispute, FERC does not have exclusive or preemptive jurisdiction over the claims brought by Jenkins in this matter. We sustain Jenkins' contentions in his second and third issues, concluding that FERC does not have exclusive preemptive jurisdiction over these proceedings and that the trial court erred in dismissing the matter for lack of subject matter jurisdiction.

## Conclusion

We make no determinations of the merits in the underlying case. We affirm the trial court's refusal to strike the intervention of EGSI, finding no abuse of discretion. We reverse the trial court's order dismissing the matter for lack of subject matter jurisdiction, and remand for further proceedings.

**20.** We note Entergy's argument that *La. Pub. Serv. Comm'n v.Entergy Servs.* involves similar issues. However, in that matter, the complaint went directly to how the schedule MSS–3 formulas were being implemented, thus challenging compliance with the FERC approved System Agreement. *See La. Pub. Serv. Comm. v. Entergy Servs.*, 106 F.E.R.C. ¶ 63,012 at 65,104, 2004 WL 226594 (2004). Jenkins' claims in this matter are not so couched.

**21.** Jenkins contends that this federal court order should direct our decision in this matter. However, no appropriate theories apply in the situation before us to support that argument. Res judicata, also known as claim preclusion, prevents the relitigation of a finally adjudicated claim and related matters that should have been litigated in a prior suit. *State and County Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex.2001). The "law of the case" doctrine is the principle under

which questions of law "decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Id.* Collateral estoppel is narrower than res judicata, precluding only the relitigation of identical ultimate issues of fact that have already been actually litigated and that were essential to the judgment in a prior suit. *See Bonniwell v. Beech Aircraft Co.*, 663 S.W.2d 816, 818 (Tex. 1984). "Collateral estoppel issues concern only whether: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, and (2) those facts were essential to the judgment in the first action." *Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 519 (Tex.1998). Jenkins urges that collateral estoppel should and can apply to a case after remand from federal court. We need not make this determination here inasmuch as collateral estoppel applies to fact issues, and jurisdiction is a question of law.