812 F.2d 898
 APPALACHIAN POWER COMPANY; American Electric Power Company,
Inc.; Kentucky Power Company; Columbus and Southern Ohio
Electric Co.; Indiana & Michigan Electric Company; Ohio
Power Company, Appellees,
v.
PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; Otis D. Casto,
as a member of Public Service Commission of West Virginia;
Michael D. Greer, as a member of Public Service Commission
of West Virginia, Defendants,
and
Consumer Advocate Division of the West Virginia Public
Service Commission, Appellant.
Federal Energy Regulatory Commission, Amicus Curiae.
APPALACHIAN POWER COMPANY; American Electric Power Company,
Inc.; Kentucky Power Company; Columbus and Southern Ohio
Electric Co.; Indiana & Michigan Electric Company; Ohio
Power Company, Appellees,
v.
PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; Otis D. Casto,
as a member of Public Service Commission of West Virginia;
Michael D. Greer, as a member of Public Service Commission
of West Virginia, Appellants,
and
Consumer Advocate Division of the West Virginia Public
Service Commission, Defendant.
 Nos. 86-2540, 86-2541.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 12, 1986.
Decided March 4, 1987.
 
 Richard E. Hitt, Jackson, Miss., Billy Jack Gregg, Culloden, W. Va. (Mark G. Thessin, on brief), for appellants.
 Charles McElwee, Charleston, W. Va., (William C. Porth, Robinson & McElwee, Charleston, W. Va., A. Joseph Dowd, Edward J. Brady, New York City, Kevin F. Duffy, on brief), for appellees.
 (William H. Satterfield, General Counsel; Jerome M. Feit, Sol., Joanne Leveque, Washington, D.C., on brief), for amicus curiae.
 Before PHILLIPS and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Appalachian Power Company, Inc. (APC), its parent, American Electric Power Company, Inc. (AEP), and their various affiliates[1] filed suit in the United States District Court for the Southern District of West Virginia seeking declaratory and injunctive relief against the Public Service Commission of West Virginia (PSC)[2] regarding a December 28, 1984, PSC order. The complaint alleged that the PSC order violated the supremacy clause of the United States Constitution insofar as it asserted state authority to scrutinize an agreement allocating among utility companies operating in several states the cost burdens of an interstate energy transmission network. The power companies argued that scrutiny of the agreement is a matter exclusively reserved to the Federal Energy Regulatory Commission (FERC) by subchapter II of the Federal Power Act (FPA), 16 U.S.C. Sec. 824 et seq. and thus that state authority is preempted by that Act. They additionally challenged the PSC order as violative of the interstate commerce and due process clauses of the constitution. In granting the companies' motion for summary judgment, the district court found violations of both the supremacy clause and the interstate commerce clause and declined to consider the due process claim. We agree that the PSC's assertion of authority is preempted by the FPA, that FERC has exclusive jurisdiction to consider the merits of the interstate agreement. As did the district court, 630 F.Supp. 656, we decline to consider the due process claim and additionally do not measure the impact of the challenged PSC order upon interstate commerce.
 
 
 2
 * APC, an electric generating company selling power to residential, commercial, and industrial customers throughout the states of Virginia and West Virginia, is a member of a highly integrated network for the transmission of electricity in interstate commerce. The network is comprised of a parent holding company, AEP, and various utility companies, such as APC, located in several states and wholly owned by AEP. These affiliated utilities are interconnected by means of an extra-high voltage (EHV) interstate electric transmission system over which energy can be transmitted in bulk from one location to another. The network stretches some four hundred miles from the Illinois border in the west to the Pennsylvania border in the east, and some five hundred miles from southwest Michigan in the north to the North Carolina border in the south. The system is operated with central dispatch, the least-cost units being operated first to permit the most economical use of the system as a whole. Each constituent company is subject to both FERC regulation pursuant to the FPA, 16 U.S.C. Sec. 824 et seq., and to regulation by the utility commission in its state of operation, e.g., W. Va. Code ch. 24 (1986). APC is the only affiliate subject to regulation by the West Virginia PSC.
 
 
 3
 Traditionally, each constituent company has owned, maintained, and borne the entire cost of that portion of the EHV lines located in its state or designated service area.[3] This arrangement began to change on April 1, 1984, when the AEP companies entered into the Transmission Equalization Agreement (TEA), which allocates costs according to a formula that accounts for the demand each company places on the system. Under the TEA, those members of the system whose actual investments in the transmission network exceed their share of the total AEP system investment are deemed "surplus" members, and those having an investment less than their share of the total are "deficit" members. Through monthly equalization payments, the TEA anticipates that "deficit" companies will make payments to "surplus" companies. As a "deficit" company, APC's share of costs for the EHV system under the TEA are greater than under the former arrangement.
 
 
 4
 Pursuant to the FPA, which gives FERC jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce and the facilities for such transmission, 16 U.S.C. Sec. 824(b)(1), the utility companies submitted the TEA for FERC approval on March 29, 1984. On August 21, 1984, FERC accepted the agreement for filing as a rate schedule and provided that it would become effective January 22, 1985, subject to refund if thereafter FERC found the terms of the TEA unjust or unreasonable. The PSC and the Consumer Advocate Division of the Public Service Commission of West Virginia (CAD) both intervened in the FERC proceedings. FERC's decision on the merits of the TEA is still pending.
 
 
 5
 In a state retail rate setting case, APC requested that the PSC allow APC's retail rates to reflect the costs incurred under the TEA. On September 28, 1984, the PSC agreed to pass the TEA costs to APC's customers, subject to refund if FERC, in the pending proceedings, found the TEA unjust or unreasonable. In its September 28 order, the PSC deferred to FERC because it believed state consideration of the TEA's merits was preempted by federal law. In a reconsideration of the September 28 order, prompted by a request from the CAD, the PSC reversed its position on the preemption issue and decided that APC did have to submit the TEA for PSC approval, pursuant to W. Va. Code Sec. 24-2-12(f), which requires state approval of contracts among affiliated utility companies. In a revised order entered on December 28, 1984, the PSC also denied APC retail rate recovery of $1.6 million in costs incurred under the agreement, pending the required PSC approval.
 
 
 6
 APC and its affiliates instituted this action on January 18, 1985, challenging the December 28 order and seeking declaratory and injunctive relief. APC claimed that the PSC's authority to consider the TEA was preempted by the FPA. APC also alleged that the December 28 order impermissibly burdened interstate commerce and violated the due process clause. The CAD intervened on the side of defendants.
 
 
 7
 In an effort to clarify the jurisdictional issue upon which the efficacy of its December 28 order depended, the PSC filed a motion with FERC on March 19, 1985, requesting that FERC limit its consideration of the TEA to whether the terms of the agreement were just and reasonable and determine what regulatory body has power to assess the "prudence" of the agreement. The isolated "prudence" inquiry, which the PSC asserts authority to make, focuses upon whether a company such as APC made a prudent choice among alternative arrangements for energy supply when it signed the agreement. This inquiry is urged by PSC to be distinct from the FERC determination whether the terms of the TEA are fair.
 
 
 8
 On February 22, 1985, before FERC responded to the PSC's request, the district court granted APC a preliminary injunction, effectively reinstating the September 28, 1984, PSC order. This court affirmed the district court's action on July 25, 1985. Appalachian Power Co. v. Consumer Advocate Division of the West Virginia Public Service Commission, 770 F.2d 159 (4th Cir.1985).
 
 
 9
 While the preliminary injunction was in effect, but before entry of final judgment in the district court, FERC responded to the PSC's March 19, 1985, motion to clarify the jurisdictional issue, ruling that the issue of the TEA's prudence was not one that state commissions could consider. The PSC then requested that FERC rehear the issue, and, in an October 1, 1986, order, FERC reiterated its position that state authority to consider the TEA's "prudence" is preempted by the FPA.
 
 
 10
 On August 12, 1985, the PSC filed a motion with the district court to stay its proceedings, arguing that the jurisdictional issue still was pending before FERC and was more appropriately decided in the administrative setting. This motion was denied.
 
 
 11
 On November 22, 1985, while the preliminary injunction was in effect, the PSC issued a new order granting APC's rate increase request, including the costs incurred under the TEA. As had the September 28, 1984, order, the newest order made recovery of the TEA's rates subject to refund if FERC found the TEA unjust or unreasonable. The November 22 order also released APC from the requirement of submitting the TEA for PSC approval.
 
 
 12
 On February 14, 1986, the district court granted APC's motions for summary judgment on the preemption and commerce clause claims. The court concluded that FERC's authority under the FPA to regulate the transmission and wholesale rates charged for transmission of energy in interstate commerce includes the power to determine the reasonableness of any contract affecting a rate or charge for the use of facilities involved in the transmission of energy from one state to another. Because the FPA provides a complete scheme for regulation of transmission of energy in commerce and ensures protection of a broader public interest than that protected by the states, there is no place for the type of state authority asserted by the PSC. The court found that if the PSC acted, as would be its prerogative under W. Va. Code Sec. 24-2-12(f) (1986), to disapprove the FERC-approved TEA or to deny recovery of costs incurred under the TEA in APC's retail rates, the PSC would regulate interstate transmission indirectly, something it could not do directly. Appeals by the PSC and CAD, which we have consolidated, followed.
 
 II
 
 13
 The primary issue in this case is whether the prudence inquiry the PSC seeks to make is preempted by the FPA's delegation of authority to FERC. More specifically, the issue is whether, in giving FERC authority to regulate the transmission and wholesale sale of energy in interstate commerce, including the facilities and rates for such transmissions and sales, Congress left open to the states the power to consider the prudence of agreements regarding interstate energy exchanges.
 
 
 14
 We examine first the repositories of state and federal authority. FERC's jurisdiction to consider the merits of the TEA follows from its general power over "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce." 16 U.S.C. Sec. 824(a). To effectuate this general power, the FPA specifically delegates to FERC regulatory authority over the facilities used for the transmission and sale of interstate energy, 16 U.S.C. Sec. 824(b)(1), and over "rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission," 16 U.S.C. Sec. 824d(a). FERC's role is to determine whether such rates and charges are just and reasonable and not unduly preferential, discriminatory, or disadvantageous to any party. 16 U.S.C. Secs. 824d, 824e. FERC's jurisdiction over interstate wholesale rates is exclusive. E.g., Nantahala Power & Light Co. v. Thornburg, --- U.S. ----, ----, 106 S.Ct. 2349, 2351, 90 L.Ed.2d 943 (1986).
 
 
 15
 Because the AEP network is a system for the transmission of interstate energy, FERC's jurisdiction to approve the TEA follows from its authority to regulate facilities used for such transmission. Alternatively, FERC jurisdiction over the TEA may be viewed as an exercise of its authority to scrutinize "rates or charges" for the transmission and sale of energy in commerce. Although the TEA does not explicitly set a dollar rate for the transmission and sale of electricity in commerce, it has the same effect as if it did in that it creates the obligations owed by or payable to utility companies for the privilege of exchanging interstate electricity. As such, it is subject to FERC's exclusive jurisdiction over interstate rates.
 
 
 16
 The PSC's assertion of authority to consider the merits of the TEA is based upon W. Va. Code Sec. 24-2-12(f), which requires PSC consent and approval before any public utility subject to the state's regulatory authority
 
 
 17
 by any means, direct or indirect, enter[s] into any contract or arrangement for management, construction, engineering, supply or financial services or for the furnishing of any other service, property or thing, with any affiliated corporation, person or interest.
 
 
 18
 In deciding whether to approve such contracts the PSC considers whether the contract's terms are reasonable, whether the contract gives any party an undue advantage, and whether the contract is in the public interest of the state. Id. at Sec. 24-2-12. Any costs incurred under a contract that the PSC disapproves are not recoverable in the contracting utility's retail rates.
 
 
 19
 The PSC and CAD contend that the authority granted by W. Va. Code Sec. 24-2-12(f) remains intact notwithstanding FERC jurisdiction under the FPA because of the language in the FPA's policy statement limiting "Federal regulation ... to those matters which are not subject to regulation by the States." 16 U.S.C. Sec. 824(a). The PSC argues that this statutory limitation upon federal jurisdiction forestalls the preemptive effect of the FPA in this case. According to the appellants, there is room for state consideration of what is labeled the "prudence" of the TEA, because the inquiry into prudence is different from that undertaken by FERC.
 
 
 20
 We disagree, and conclude instead that the prudence inquiry the PSC wishes to make is not different from the FERC inquiry into the justness and reasonableness of the TEA. In support of their argument that the prudence inquiry the PSC would make under W. Va. Code Sec. 24-2-12(f) is distinguishable from--and thus not in potential competition with--the FERC consideration whether the TEA is just and reasonable, appellants rely upon Pike County Light & Power Co. v. Pennsylvania Public Utility Commission, 77 Pa.Cmwlth. 268, 465 A.2d 735 (1983). In Pike County, a Pennsylvania court ruled that a state commission retains power, in setting retail rates, to consider and reject the wisdom of a utility's contract to purchase interstate power at wholesale even though FERC, in setting the wholesale rate, already has found the terms of the interstate arrangement just and reasonable. The Pennsylvania court reasoned that the FERC inquiry focuses upon the wisdom of the sale from the perspective of the selling utility and its investors, leaving the state commission to consider the wisdom of the arrangement from the perspective of the buying utility and its investors and retail customers. Moreover, the issue before the state commission differs from that before FERC. The state commission considers whether the purchasing utility chose wisely among alternative sources of energy supply in entering into the particular agreement, not whether the terms of the agreement are just and reasonable.
 
 
 21
 While Pike County does recognize a realm of state authority to consider interstate agreements that FERC, in a slightly different context, also considers, we do not believe the facts of the instant case permit invocation of that state authority even if the Pike County analysis be accepted. On a practical level, the Pike County inquiry is meaningless here because there is no alternative source of power for APC to choose other than that available through the AEP system, and the only access to that power is over the EHV lines whose costs are allocated by the TEA. Because the essence of the Pike County inquiry is whether a particular choice was wise, the lack of choice here makes such an inquiry an empty one. In the Nantahala case, --- U.S. ----, 106 S.Ct. 2349, the Supreme Court recently recognized a similar futility in invoking the Pike County analysis. In Nantahala, the North Carolina Utilities Commission, in setting retail rates, claimed authority to apportion a particular source of "entitlement" power between two affiliated utilities after FERC already had made a fair allocation of that power in setting wholesale rates. The Court rejected as inapplicable the Pike County line of authority in part because there was only one available source for the particular "entitlement" energy at issue in Nantahala. See id., --- U.S. ---- - ----, 106 S.Ct. at 2358-60.
 
 
 22
 Another reason the distinction Pike County drew between state and federal inquiries does not exist here is that, unlike the wholesale agreement at issue in Pike County, the TEA has no distinct "buyer" and "seller" of energy. Pike County had emphasized that FERC considers interstate agreements from the seller's perspective, while state commissions focus upon the in-state buyer. The nature of the TEA and the AEP system is such that an affiliated utility could be at one time a receiver or "buyer" and at another time a supplier or "seller" of energy. FERC thus necessarily considered the fairness of the agreement from the perspective of all involved parties.
 
 
 23
 The overlapping nature of what appellants would have us delineate as two separate questions becomes even clearer when we parse and compare, as did the district court, the particular questions FERC and the PSC would ask in deciding whether to approve the TEA. FERC considers (1) whether the agreement is just and reasonable, 16 U.S.C. Sec. 824d(a); (2) whether the agreement is unduly preferential or disadvantageous to any party, id. at Sec. 824d(b); and (3) whether the agreement is in the public interest, see id. at Sec. 824(a). The PSC, under W. Va. Code Sec. 24-2-12, would consider (1) whether the terms and conditions of the TEA are reasonable; (2) whether the TEA gives one party an undue advantage over the other, and (3) whether the agreement adversely affects the public interest. The identity of the inquiries each regulatory body would make demonstrates that in considering the TEA's "prudence," the PSC simply would duplicate FERC's inquiry into the justness and reasonableness of the TEA.
 
 
 24
 This duplication is impermissible primarily because the issue of the TEA's merits falls within FERC's exclusive jurisdiction to set interstate rates. As discussed previously, although the TEA does not set a rate per se, it is in essence a rate agreement in that it sets the obligations for the privilege of receiving energy over an interstate transmission network for resale to retail customers. It thus sufficiently resembles a filed rate to come within the realm of exclusive federal jurisdiction.
 
 
 25
 The Supreme Court's recent Nantahala decision supports our conclusion that states are powerless to exert authority that potentially conflicts with FERC determinations regarding rates or agreements affecting rates. The Nantahala Court reiterated the principle that in setting retail rates states must give effect to FERC-approved wholesale rates and agreements affecting those rates. Nantahala, --- U.S. at ----, 106 S.Ct. at 2356; see also Narragansett Electric Co. v. Burke, 119 R.I. 559, 381 A.2d 1358 (1977). Applying this principle, the Court denied the North Carolina Utilities Commission power to make the same inquiry into the fairness of the allocation of "entitlement" power that FERC already had made. Once FERC had allocated the entitlement power, the North Carolina Utilities Commission's reallocation of that same power for purposes of determining retail rates eroded the effect of the FERC determination and undermined FERC's exclusive jurisdiction. See Nantahala, --- U.S. at ----, 106 S.Ct. at 2358.
 
 
 26
 Allowing the states to make the kind of prudence inquiry urged in this case not only would pose the potential for direct conflict with FERC pronouncements but also would impede accomplishment of the purposes of the FPA. Preemption principles deny state authority to act in a way that would undermine the purposes of federal law. E.g., Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404 85 L.Ed. 581 (1941). The FPA's policy statement expresses the Act's purpose as protection of the public interest affected by the transmission and sale of electric energy in interstate commerce. See 16 U.S.C. Sec. 824(a). The public interest thus protected is, of course, national in scope. The history of the FPA underlines the importance of the broad scope of the public interest the legislation seeks to protect. Congress enacted the FPA to fill a regulatory "gap" left by the case of Public Utilities Commission v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927). E.g., Pike County, 465 A.2d at 737. In Attleboro, the Supreme Court had found state regulation of rates for the interstate wholesale sale of energy an impermissible burden on commerce. The Federal Power Act created federal regulatory jurisdiction over such sales, reflecting the judgment embodied in the commerce clause that there are situations in which the broader perspective of federal authority is necessary.
 
 
 27
 Contrasted with this broad public interest protected by federal regulation is the narrower state public interest advanced by PSC regulation. See, e.g., W. Va. Code Sec. 24-2-12 (one function of the PSC is to prevent adverse effects on "the public in this state"). Because the prudence inquiry is inseparable from an inquiry into the TEA's justness and reasonableness, FERC and the PSC would be making identical, independent inquiries regarding the merits of the TEA but from the perspective of different public interests. It is possible that FERC and the PSC would reach conflicting conclusions regarding the impact of the agreement on their respective publics. Only FERC, as a central regulatory body, can make the comprehensive public interest determination contemplated by the FPA and achieve the coordinated approach to regulation found necessary in Attleboro. No single state commission has the jurisdiction, and neither can it be expected to have the competence or inclination, to make this broad determination. The likelihood of conflict in allowing each state to consider the TEA separately is highlighted by the conflicting contentions of the various states represented before the FERC proceedings regarding the TEA. Consumer groups and commissions from the various states associated with the AEP system claim that their states' citizens are unduly burdened relative to other states. Only FERC has the objectivity and comprehensive overview that transcends these local concerns.
 
 
 28
 Lodging exclusive authority in FERC to consider the merits of the TEA thus forecloses the potential for differing state pronouncements regarding an agreement involving utilities regulated by various states. Conflicting conclusions of state commissions would discourage the type of interstate arrangement represented by the AEP system. Interstate sharing of energy resources ensures that customers receive service in spite of a deficiency in generating capacity within their state. Thus, it is in the public interest not to discourage the proliferation of these multistate networks. Cf. Public Service Commission of West Virginia v. Federal Power Commission, 437 F.2d 1234, 1239 (4th Cir.1971) (discussing preemption under the Natural Gas Act, court noted that "[i]f the acquisition of rights in an interstate transportation line were subject to the veto of every state regulatory agency along the line, a single agency could seriously impair ... the interests protected by the Act and prevent FPC from performing its statutory duties").
 
 III
 
 29
 Because it is fundamentally at odds with the scheme Congress has established in the FPA to allow the states to change the arrangements filed with or established by FERC, we find the authority the PSC asserts here violative of the supremacy clause. State regulatory authorities must give effect in calculating retail rates to the costs and allocations reflected in the federally regulated transactions that precede final retail sale of energy.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 The other AEP subsidiaries joined in the complaint in this case were Kentucky Power Company, Columbus and Southern Ohio Electric Company, Indiana & Michigan Electric Company, and Ohio Power Company
 
 
 [2]
 The PSC, a state agency created by the West Virginia legislature, regulates the practices, services, and rates of public utilities operating in West Virginia. A prime function of the PSC is to protect the interests of the consuming public, in particular to ensure that the retail rates charged for utility services are just and reasonable. W. Va. Code Sec. 24-1-1 (1986)
 
 
 [3]
 One exception to this cost allocation was a 1958 agreement in which four AEP companies, including APC, shared the costs of transmission facilities in Indiana. APC at that time sought and obtained PSC approval of the agreement, acquiescing without question to the same PSC authority contested by APC in this case