United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 21, 2006**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 16, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-51755

AEP TEXAS  NORTH CO.,

Plaintiff-Appellee,

versus

TEXAS  INDUSTRIAL  ENERGY  CONSUMERS,

Intervenor-Defendant,

versus

CITIES OF ABILENE, BALLINGER, CISCO, SAN ANGELO and
VERNON, TEXAS,

Intervenor-Defendants-Appellants,

versus

THE  PUBLIC  UTILITY  COMMISSION  OF  TEXAS,  ET AL,

Defendants,

PAUL HUDSON, CHAIRMAN OF THE PUBLIC UTILITY
COMMISSION OF TEXAS; JULIE PARSLEY, COMMISSIONER
OF THE PUBLIC UTILITY COMMISSION OF TEXAS; and
BARRY T. SMITHERMAN, COMMISSIONER OF THE PUBLIC
UTILITY COMMISSION OF TEXAS,

Defendants-Appellants.

Appeals from the United States District Court for
the Western District of Texas
(USDC No. 1:04-CV-1069)

_____

Before REAVLEY, STEWART, and CLEMENT, Circuit Judges.

REAVLEY, Circuit Judge:

The issue before us is whether a state regulatory agency may set retail rates based on its own determination that a utility has not complied with a Federal Energy Regulatory Commission ("FERC") tariff. We hold that pursuant to the filed rate doctrine, federal law preempts state regulators from making a final determination as to whether a FERC tariff has been violated and from imposing a remedy for an alleged violation. We therefore affirm.

I.

A. The Merger

Appellee Texas North Company ("TNC") provides retail electric service solely in Texas. In 1999, TNC's parent, the Central and South West Company, merged with the American Electric Power Company ("AEP"). TNC is now one of nine public utilities owned by AEP.

Before the merger, AEP submitted a merger plan, termed the System

Integration Agreement (the "SIA"), for approval to FERC. FERC approved the plan. The SIA is the tariff, or rate schedule, currently filed with FERC.

When the AEP system has an excess of generating capacity, an affiliate of the utilities, called the AEP Service Corporation ("AEPSC") sells the excess power at wholesale. The SIA requires that AEPSC determine the profits from such sales, called Trading and Marketing Realizations ("TMRs"), "on an hourly basis." The SIA defines TMRs as "the difference between i) the revenues collected from Trading and Marketing Activities and ii) the Out-of-Pocket Cost of such Trading and Marketing Activities and any transmission cost related to such activities."

The SIA then mandates that from sales made by all, AEPSC will distribute the TMRs between two zones in the AEP system, according to a specific formula. The distribution occurs in two stages. First, the SIA provides that all TMRs up to a certain amount (equaling the amount of TMRs that were recorded in a Base Year, the twelve month period preceding the merger) will be allocated between the former Central and South West company (now called AEP West) and the former AEP company (now called AEP East) as they were in the Base Year. This first allocation favors AEP East. Second, all remaining TMRs are allocated between AEP East and AEP West in proportion to generating capacity. This allocation favors AEP West. Therefore, TNC is favored in the second stage of the allocation process.

B.  The Commission's Review

Immediately before Texas moved to a deregulated electricity market in 2002, the Texas Legislature mandated that the successors of the former public utilities seek a final reconciliation of their regulated fuel expenses and revenues before the Public Utility Commission of Texas (the "Commissioners").  According to Texas law, after costs and revenues are reconciled, the utilities must refund any over-recovery to the utility's retail ratepayers.  16 Tex. Admin. Code Ann. § 25.236(e) (2002).  TNC filed a petition for a final reconciliation in June 2002.

In the first proceeding related to this appeal, the Commissioners found that the TMR allocations were correctly calculated pursuant to the SIA.  On rehearing, however, the Commissioners disagreed with AEPSC's calculation of TMRs in the Base Year.  AEPSC credited the AEP East companies with the values of "open" transactions that had not yet been completed, as well as the profits from completed sales.  The Commissioners determined that including the "open" transactions (a method of accounting known as "mark-to-market") in the Base Year calculations was not consistent with the SIA, which defined TMRs as the difference between revenues collected and out-of-pocket costs.

The Commissioners then proceeded to rectify the alleged error in calculations.  The parties in the reconciliation proceeding stipulated that the

4

mark-to-market accounting resulted in $7.9 million less in revenues for TNC. The Commissioners ordered that TNC reduce its retail rates as if it had received this revenue. However, AEPSC did not change its method of calculating TMRs. Because of the lower retail rates, TNC was forced to absorb the difference between the actual allocation of revenues and the lower retail rates. TNC filed a motion for rehearing, which was overruled.

TNC filed this action in federal court, challenging the order on preemption grounds. The district court granted TNC's motion for summary judgment, finding that the Commissioners' ruling violated the Federal Power Act and the Supremacy Clause of the U.S. Constitution.

## II.

### A.

The Federal Power Act ("FPA") gives FERC exclusive jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce.[1] The filed rate doctrine, which governs this case, derives from that jurisdictional grant. "The filed rate doctrine requires 'that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility

---

[1] 16 U.S.C. § 824(b)(1).

commissions determining intrastate rates.'"[2]  The FPA and the Supremacy Clause, U.S. Const. art. VI, § 2, preempt any state action modifying or overruling a filed rate.[3]  Pursuant to the doctrine, the Supreme Court has determined that federal law preempts states from second-guessing FERC's allocations of electric power[4] and from conducting prudence inquiries into FERC's cost allocations, even when FERC has not conducted such an inquiry.[5]  In addition, states are prohibited from "trapping costs" by setting retail sales at a level that would prevent a utility "from recovering the costs of paying the FERC-approved rate."[6]

In *Entergy*, the most recent Supreme Court case dealing with the filed rate doctrine, the Court considered "whether a FERC tariff that delegates discretion to the regulated entity to determine [a] precise cost allocation. . .   preempts a [state commission's] order that adjudges those costs imprudent."[7]  The Entergy

---

[2] *Entergy Louisiana, Inc., v. Louisiana Pub. Serv. Comm'n*, 539 U.S. 39, 47, 123 S.Ct. 2050, 2056 (2003) ("*Entergy*") (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962, 106 S. Ct. 2349, 2354 (1986)).

[3] *Entergy*, 539 U.S. at 47, 123 S. Ct. at 2056.

[4] *Nantahala*, 467 U.S.  at 955, 106 S. Ct. at 2351.

[5] *Mississippi Power & Light Co. v. Moore,* 487 U.S. 354, 357, 108 S. Ct. 2428, 2431 (1988).

[6] *Nantahala*, 467 U.S. at 970, 106 S. Ct. at 2358–59.

[7] *Entergy*, 539 U.S. at 42, 123 S. Ct. at 2053.

Corporation owned five different public utilities, which could use each other's excess capacity. The costs of keeping excess capacity available were shared among the utilities according to a provision in a system agreement, filed with FERC, that Entergy's operating committee administered. The provision at issue was an automatic adjustment clause, which under § 205(f) of the FPA allows for increases or decreases in a utility's paid costs without prior hearings.[8] In determining costs, the operating committee designated certain generating units (called Extended Reserve Shutdown, or ERS, units) as "available" when those units were actually shut down, but could be activated in emergencies.[9] This designation caused Entergy Louisiana, Inc., a utility with ERS units, to pay a higher percentage of costs. The Louisiana Public Service Commission found that although it was preempted from determining whether the system agreement was violated, it could determine that Entergy's expenditures were imprudent because Entergy paid more for possessing ERS units.[10] Thus, the Louisiana Commission did not allow Entergy to increase

---

[8] *Id.* at 42–43, 123 S. Ct. at 2053–54.

[9] *Id.* at 43, 123 S. Ct. at 2054.

[10] The Louisiana Public Service Commission looked only at the time period after August 5, 1997, as FERC had already found that categorizing the ERS units as "available" was reasonable prior to August 5, 1997. *Id.* at 44, 123 S. Ct. at 2054.

retail rates to cover those costs.[11]

The Supreme Court reversed, holding that the Commission's prudence inquiry was preempted even though the proper classification of ERS units was not pursuant to a specific mandate from FERC, but instead was within the discretion of the operating committee.[12] The Court found that the Commission's order impermissibly "trapped costs" by failing to allow Entergy to recoup the costs of paying for the ERS units.[13]

B.

Here, we also consider a tariff which designates an agent to perform an allocation (although *Entergy* involved an allocation of costs, rather than revenues). Appellants argue that the instant case can be distinguished from *Entergy* because in this case, AEPSC's interpretation of the formula violated the language of the filed tariff, an issue which was not before the Court in *Entergy*.[14] They contend that the Commissioners' order correctly interpreted the tariff, and therefore fulfilled the

---

[11] *Id.* at 45, 123 S. Ct. at 2055.

[12] *Id.* at 49–50, 123 S. Ct. at 2057 ("We see no reason to create an exception to the filed rate doctrine for tariffs of this type that would substantially limit FERC's flexibility in approving cost allocation arrangements.").

[13] *Entergy*, 539 U.S. at 49, 123 S. Ct. at 2056.

[14] *Id.* at 50–51, 123 S. Ct. at 2058.

state's obligation to implement the filed rate.

Although Appellants argue the Commissioners' order implemented the filed rate, the entire SIA, not simply the formula in question, is filed with FERC. "[T]he filed rate doctrine is not limited to 'rates' *per se*."[15] The states are bound to implement a FERC-approved agreement, and the agreement authorizes only AEPSC to implement the formula.[16]

Furthermore, FERC, not the state, is the appropriate arbiter of any disputes involving a tariff's interpretation.[17] Congress has given FERC exclusive jurisdiction to determine whether wholesale rates are just and reasonable.[18] Additionally, it is FERC's duty under the FPA to make an assessment of the broad public interests

---

[15] *Nantahala Power & Light Co. v. Thornburg*, 467 U.S. 953, 966, 106 S. Ct. 2349, 2357 (1986). *See also Entergy*, 539 U.S. at 50, 123 S. Ct. at 2056 ("It matters. . . only whether the FERC tariff dictates how and by whom [the] classification should be made.").

[16] *See Mississippi Power & Light Co. v. Moore,* 487 U.S. 354, 374, 108 S. Ct. 2428, 2440 (1988) ("States may not regulate in areas where FERC has properly exercised its jurisdiction . . . to insure that agreements affecting wholesale rates are reasonable.").

[17] *See id.* at 2442–43 (1988) (Scalia, J., concurring) ("[W]hether one characterizes the questions as related to prudence, interpretation [of the basic system agreements], or cost allocation, they are clearly matters most appropriately resolved by the Commission as part of its overriding authority to evaluate and implement all applicable wholesale rate schedules.") (quoting *AEP Generating Co.*, 36 FERC ¶ 61, 226 (1986)).

[18] 16 U.S.C. §§ 824d, 824e. *See also Mississippi Power*, 487 U.S. at 377, 108 S. Ct. at 2442 (Scalia, J., concurring) ("It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject.").

involved in determining interstate rates.[19]  If each state could enforce its own findings as to the meaning of a filed tariff, in opposition to the conclusions of a FERC-approved agent, the conflicting interpretations would undermine FERC's ability to ensure that a filed rate is uniform across different states, and intrude upon its exclusive jurisdiction over interstate power transactions.[20]  Therefore, it is within FERC's jurisdiction, not the states', to make a final determination as to whether the tariff has been violated.  If a state disputes a utility's interpretation of a tariff, FERC is the proper forum for resolving the disagreement.[21]

Finally, the FPA gives FERC exclusive jurisdiction to remedy tariff violations by providing refunds.[22]  If states could remedy perceived violations by setting retail rates based on their own calculations, states could potentially "trap" costs by prohibiting the utility from passing on the price of FERC-mandated rates to consumers.[23]  Thus, the filed rate doctrine requires that the states use AEPSC's

---

[19] *See* 16 U.S.C. § 824(a).

[20] *See Appalachian Power Co. v. Public Service Comm'n of West Virginia*, 812 F.2d 898, 905 (4th Cir. 1987).

[21] *Cf. Mississippi Power*, 487 U.S. at 375, 108 S. Ct. at 2241 (finding that the "only appropriate forum" for determining the reasonableness of filed rates and agreements "is before the Commission or a court reviewing the Commission's order.").

[22] *See* 16 U.S.C. § 824e.

[23] *See Mississippi Power*, 487 U.S. at 372, 108 S. Ct. at 2439.  Appellants claim that in this case, no costs were "trapped" because the formula at issue involved the allocation of revenue,

calculations to set retail rates until FERC resolves any dispute over the tariff's

interpretation.

III.

We find that the Commission's actions were preempted by the Supremacy

Clause and the Federal Power Act.

AFFIRMED.

---

not costs. Nonetheless, the result was the same: the utility lost money.