**Opinion issued November 6, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00470-CV

————————————

**ENTERGY CORPORATION, ENTERGY SERVICES, INC., ENTERGY POWER, INC., ENTERGY POWER MARKETING CORPORATION, ENTERGY ARKANSAS, INC., AND ENTERGY TEXAS, INC., Appellants**

**V.**

**DAVID JENKINS, GEORGE W. STRONG, FRANCIS N. GANS, AND GARY M. GANS, INDIVIDUALLY AND ON BEHALF OF ALL PERSONS SIMILARLY SITUATED, Appellees**

---

**On Appeal from the 344th District Court**
**Chambers County, Texas**
**Trial Court Case No. CV20666**

---

### O P I N I O N

This is an interlocutory appeal challenging the trial court's order certifying a

class action in a suit brought under the Texas Theft Liability Act ("the Theft

Act").[1]  In three issues, appellants, Entergy Corporation, Entergy Services, Inc., Entergy Power, Inc., Entergy Power Marketing Corporation, Entergy Arkansas, Inc., and Entergy Texas, Inc. (collectively, "Entergy"), contend that the trial court (1) lacked subject matter jurisdiction over this suit, (2) abused its discretion in finding that the requisites for class certification had been established, and (3) abused its discretion by making findings of fact and conclusions of law that misstate and misapply the applicable law.

We reverse and render.

## Background

### A.    *Factual Background*

Entergy Corporation is a public utilities holding company with six electric utility operating companies: Entergy Gulf States Louisiana, L.L.C., Entergy Arkansas, Inc., Entergy Louisiana, LLC, Entergy Mississippi, Inc., Entergy New Orleans, Inc., and Entergy Texas, Inc. ("ETI").  These six companies, which operate in four southern states, provide electrical service to approximately 2.6 million retail customers.[2]

---

[1]    TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (Vernon 2011 & Supp. 2014).

[2]    The generation and bulk transmission assets of these six companies are referred to as the "Entergy System."

2

Each operating company has electricity generation facilities, consisting of nuclear, coal, natural gas, or oil-fired generating plants. The companies are parties to the Entergy System Agreement ("ESA"), a federal tariff under which power is shared and distributed.[3] The companies also purchase power from each other and from non-affiliated third parties in the power market. The ESA provides for centralized control of power purchases, operations, and use of available resources throughout the Entergy System. Although each company operates its generation, transmission, and distribution systems independently, production, purchasing, and sale of wholesale electricity on behalf of those companies to meet the needs of retail and wholesale customers are controlled centrally by Entergy Services, Inc. ("ESI").

ESI operates a Systems Operation Center, located in The Woodlands, which controls the selection of power ("dispatch decisions"). The ESA permits the System Operator to purchase power at wholesale from third-party suppliers. The System Operator controls daily operations and is in charge of determining whether system-generated power is sufficient to meet capacity needs or whether purchasing third-party power is necessary. ESI performs a monthly accounting, assigning a portion of the total power resources used by the whole system to each operating

---

[3] A "tariff" is a document listing a public utility's rates and services and having the force and effect of law. *See First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 489 (Tex. App.—Dallas 2001, no pet.).

company, generating an "intra-system" bill. The cost is dictated by a formula in Service Schedule MSS-3 of the ESA, which governs the intra-company accounting for system resources.

### B.    *Procedural Background*

On August 5, 2003, David Jenkins, George W. Strong, Francis N. Gans, and Gary M. Gans, individually and on behalf of all persons similarly situated (collectively, "Jenkins"), filed suit against Entergy[4] alleging that it had devised and operated an improper energy-purchasing scheme under which it had selected internally generated, higher-priced electrical power while rejecting less expensive, available third-party power, resulting in theft from Texas retail power customers in violation of the Theft Act. On September 15, 2003, Entergy removed the suit to federal court alleging federal question jurisdiction. The federal court remanded the case to state court, concluding that the suit did not invoke federal law.

On April 23, 2004, Entergy filed a motion to dismiss for want of jurisdiction, contending that jurisdiction of Jenkins's claims was preempted by the Federal Energy Regulatory Commission ("FERC") and the Texas Public Utilities Commission ("PUC") and that the claims were also barred by the filed-rate doctrine. On November 24, 2004, the trial court granted Entergy's motion to dismiss, finding that it lacked subject matter jurisdiction over Jenkins's claims.

---

[4]    Although not originally named as a defendant in the suit, Entergy Gulf States, Inc. (appellant ETI's predecessor) later intervened.

4

Jenkins appealed the trial court's order dismissing the case. In *Jenkins v. Entergy Corp.*, 187 S.W.3d 785 (Tex. App.—Corpus Christi 2006, pet. denied) ("*Jenkins I*"), the Corpus Christi Court of Appeals reversed the trial court's order dismissing the suit for lack of subject matter jurisdiction. On June 6, 2012, Jenkins filed a motion to certify a class consisting of Texas retail customers served by ETI who were billed and paid for electric power from January 1, 1994, to present. Entergy filed a second motion to dismiss for lack of jurisdiction and three motions for summary judgment. The trial court denied the motion to dismiss and the summary judgment motions.

The parties submitted extensive briefing on class certification issues, and the trial court held a certification hearing lasting several days. On April 30, 2012, the trial court granted Jenkins's motion for class certification and issued extensive findings of fact and conclusions of law. Entergy timely perfected this interlocutory appeal.

**Analysis**

In three issues, Entergy contends that the trial court (1) lacks subject matter jurisdiction over Jenkins's claims, (2) abused its discretion in finding that Jenkins had established the requirements for class certification, and (3) abused its discretion by making findings of fact and conclusions of law that misstate and misapply the law. Jenkins argues that *Jenkins I*, which rejected Entergy's

5

jurisdictional arguments, is the law of the case and prohibits reconsideration of the subject matter jurisdiction issue. Entergy urges us to find that *Jenkins I* is not the law of the case because (1) the circumstances and evidence have changed, (2) *Jenkins I* was wrongly decided, (3) the law of the case doctrine should not be applied to subject-matter jurisdiction determinations, and (4) *Jenkins I* did not address all of the issues raised in this appeal.

### A.    *Law of the Case*

Because this case comes to us on appeal following remand for further proceedings in the trial court by the Corpus Christi Court of Appeals in *Jenkins I*, which reversed the trial court's previous order dismissing the case for want of jurisdiction, we consider, as a preliminary matter, the law of the case doctrine to determine whether the Corpus Christi Court of Appeals' decision prevents us from considering Entergy's jurisdictional arguments.

"Subject matter jurisdiction is 'essential to a court's power to decide a case.'" *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000)). "Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 578 (Tex. 2013) (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, 127 S. Ct. 1184,

6

1191 (2007)).  "The failure of a jurisdictional requirement deprives the court of the power to act (other than to determine that is has no jurisdiction), and ever to have acted, as a matter of law."  *City of DeSoto v. White*, 288 S.W.3d 359, 393 (Tex. 2009) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 359 (Tex. 2004)).  Thus, "[a] judgment is void if rendered by a court without subject matter jurisdiction."  *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010) (orig. proceeding).  "[N]ot only *may* an issue of subject matter jurisdiction 'be raised for the first time on appeal by the parties or by the court', a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties questioned it."  *Id.* at 306 (quoting *Loutzenhiser*, 140 S.W.3d at 358) (emphasis in original); *City of Allen v. Pub. Util. Comm'n of Tex.*, 161 S.W.3d 195, 199 (Tex. App.—Austin 2005, no pet.) ("[T]he question of jurisdiction is fundamental and can be raised at any time in the trial of a case or on appeal.").

The law of the case doctrine is defined as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages."  *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006); *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 373 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  Under the law of the case doctrine, a court of appeals will ordinarily be bound by its initial decision if there is a subsequent appeal in the case.  *Briscoe v. Goodmark Corp.*,

7

102 S.W.3d 714, 716 (Tex. 2003). "By narrowing the issues in the successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency." *Id.* (quoting *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). This doctrine is based on public policy and is aimed at bringing finality to litigation. *Id.*

A decision rendered on an issue by an appellate court does not, however, absolutely bar reconsideration of the issue on a second appeal. *Id.* Rather, the law of the case doctrine "'merely expresses the practice of the courts generally to refuse to reopen what has been decided.'" *See It's the Berry's, LLC v. Edom Corner, LLC*, 271 S.W.3d 765, 771 (Tex. App.—Amarillo 2008, no pet.) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S. Ct. 739, 740 (1912)). The application of the doctrine lies within the discretion of the court, depending on the circumstances of the case. *Briscoe*, 102 S.w.3d at 716. The doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first trial.[5] *Pitman v. Lightfoot*, 937 S.W.2d 496, 513 (Tex. App.—San Antonio 1996, writ denied). Moreover, it is an exception to the law of the case doctrine that the original decision was clearly erroneous. *Briscoe*, 102 S.W.3d at 716.

---

[5] The other occasion allowing the doctrine to be set aside—when a partial summary judgment is followed by a trial on the merits—is not relevant to this appeal. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630–31 (Tex. 1986).

Most critically, the law of the case doctrine does not either confer or limit subject matter jurisdiction and is not a limitation on the power of the courts to act. *See It's the Berry's*, 271 S.W.3d at 771–72 (refusing to apply law of the case doctrine to bar review of district court's exercise of subject matter jurisdiction on estoppel grounds). "Subject matter jurisdiction cannot be conferred by consent, waiver, or estoppel at any stage of a proceeding." *Id.* (quoting *Tourneau Houston, Inc. v. Harris Cnty. Appraisal Dist.*, 24 S.W.3d 907, 910 (Tex. App.—Houston [1st Dist.] 2000, no pet.)). It follows that subject matter jurisdiction cannot be conferred by a prior decision in the case.

Given this law, we review de novo the issue of whether the Texas courts have subject matter jurisdiction over Jenkins's claims. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d at 306 (holding that appellate court is "*obliged* to ascertain that subject matter jurisdiction exists," even *sua sponte* on appeal if not raised by parties).

### B.  *Entergy's Jurisdictional Arguments*

Entergy argues that the trial court lacks subject matter jurisdiction over Jenkins's claims for several reasons. First, Entergy argues that the FERC has exclusive jurisdiction over Jenkins's claims. Second, Entergy argues that if this Court determines that FERC does not have exclusive jurisdiction, then the PUC, which governs retail rates for power sold to Texas consumers, has exclusive

9

jurisdiction over this case. Third, Entergy asserts that both the federal and Texas filed-rate doctrines bar Jenkins's suit. We conclude that FERC has exclusive jurisdiction over Jenkins's claims and, therefore, appellees' claims must be dismissed.

### 1. Exclusive Jurisdiction

An agency has exclusive jurisdiction when Congress or the Legislature has granted that agency the sole authority to make an initial determination in a dispute. *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004) (orig. proceeding); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002). Likewise, an agency has exclusive jurisdiction "'when a pervasive regulatory scheme indicates that Congress intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.'" *In re Entergy Corp.*, 142 S.W.3d at 322 (quoting *David McDavid Nissan*, 84 S.W.3d at 221)). If an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking review of the agency's action. *Id.* at 321 (citing *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex. 2000)). Until the party has exhausted all administrative remedies, the trial court lacks subject matter jurisdiction and must dismiss any claims that fall within the agency's exclusive jurisdiction. *Id.* at 321–22; *Oncor Elec. Delivery Co. LLC v. Giovanni Homes Corp.*, 438 S.W.3d 644, 648 (Tex. App.—Fort Worth 2014, no pet. h.). Whether

10

an agency has exclusive jurisdiction is a question of law that we review de novo. *In re Entergy Corp.*, 142 S.W.3d at 322; *David McDavid Nissan*, 84 S.W.3d at 222.

### 2. FERC's Jurisdiction

Jenkins claims that ETI, in conspiracy with its parent and affiliates (Entergy), stole the class's money by charging them for using ETI-generated electrical power or power purchased from other entities within the Entergy System instead of cheaper power available from third parties, in violation of the Theft Act.

The Corpus Christi Court of Appeals noted in *Jenkins I* that the ESA provides that: (1) the companies within the Entergy System, with the consent of or under conditions specified by the operating committee, may agree to purchase capacity or energy from outside sources that, if purchased by the operating company, shall be allocated amongst the companies in the System in any manner mutually agreeable to them; (2) the operating committee may purchase energy under economic dispatch or emergency conditions; (3) the operating committee is to ensure the continuous supply or capacity of energy, provide for and coordinate safe dispatching and the proper distribution of reserves, coordinate negotiations for the interchange and sale of power and energy, including the sale and delivery to others on a profitable basis of power and energy not required for system purposes, and to secure power from external sources as may be required or will result in

11

savings to the companies; and (4) the operating committee shall determine availability of energy for purchase from or sale to outside systems in an economical manner. *See* 187 S.W.3d at 806.

As Entergy explains and its evidence shows, electricity cannot be practically stored. Rather, at all times, available power must match demand, which is based upon ever-changing customer usage. To match power and demand, Entergy selects generating resources to meet estimated future demand (the commitment process) and determines the level at which committed resources will be operated and adjusted to meet the instantaneous demand (the demand process). These processes involve determining what third-party power is available, what price the seller is demanding, what quantity is available each hour, whether transmission service is available to deliver the purchased power to where it is needed, whether available third-party power can be automatically dispatched or must be purchased in unchangeable blocks of time and energy, whether there is Entergy generation that could and should be displaced, and whether reserve requirements can be met.

Operation of the System requires that a significant portion of the System's resources be able to respond to changes in demand through instantaneous changes in the amount of electricity provided, which requires flexible system generators. Entergy relies on flexible generation to be able to comply with federal law, which permits industrial co-generators on the Gulf Coast to require Entergy to take excess

power into the System or to cease supplying power to the System without notice. Entergy avers that third-party power is generally not flexible, limiting the amount of third-party power the Entergy System can use.

Entergy's fuel and purchased-power costs are subjected to scrutiny by FERC under the Federal Power Act ("FPA") and by the PUC under the Public Utilities Regulatory Act ("PURA"). FERC regulates wholesale power transactions and has exclusive jurisdiction over wholesale power rates. The PUC governs ETI's recovery of fuel and purchased-power costs from its customers and, in fuel reconciliation proceedings, it reviews and makes a final determination as to the reasonableness and necessity of ETI's incurred fuel and purchased-power costs. The cost of system-generated or purchased power is charged directly to ratepayers, subject to PUC prudence review. This cost charged to ratepayers is the subject of Jenkins's sole complaint—that Entergy has over-charged appellees in violation of the Theft Act.

Under the FPA, FERC has exclusive jurisdiction of the wholesale sale or transmission of electricity in interstate commerce. *See* 16 U.S.C.A. § 824(a), (b)(1); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41, 123 S. Ct. 2050, 2053 (2003). FERC's exclusive jurisdiction extends not only to rates but also to power allocations that affect wholesale rates. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371–72, 108 S. Ct. 2428, 2439 (1988)

13

(holding that states may not alter allocations of power ordered by FERC by substituting their own determinations of what would be just and fair; FERC-mandated allocations of power are binding on states and must be treated as fair and reasonable when determining retail rates, and "[s]tates may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates").

FERC's jurisdiction encompasses the determination of just and reasonable rates—including all classifications, practices, regulations, and contracts affecting rates, as well as the authority to hear complaints that an existing rate (or associated charge, classification, rule, regulation, practice or contract) is unjust, unreasonable, unduly discriminatory or preferential. *See* 16 U.S.C.A. §§ 824d, 824e. FERC also has exclusive jurisdiction to make a final determination as to whether the rate has been violated. *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 586 (5th Cir. 2006). The "filed rate doctrine" requires that interstate power rates filed with, or fixed by, FERC must be given binding effect by state utility commissions determining intrastate rates in that the FPA and the Supremacy Clause preempt any state action modifying or overruling the filed rate. *See* 16 U.S.C.A. § 824(b)(1); *Entergy La.*, 539 U.S. at 47, 123 S. Ct. at 2056; *AEP Tex. N. Co.*, 473 F.3d at 584.

The FPA gives states, municipalities, and retail ratepayers the right to participate in FERC proceedings and to file complaints. 16 U.S.C.A. §§ 824d, 824e, 825e. The FPA also gives FERC exclusive jurisdiction to remedy rate violations by providing refunds. *Id.* § 824e; *AEP Tex. N. Co.*, 473 F.3d at 586. And it provides civil penalties for violating any provision of the governing chapter of the FPA or any rule or order thereunder. 16 U.S.C.A. § 825o-1(b).

*Entergy Louisiana* involved the same group of energy companies as in this case and a similar issue involving FERC preemption of state utility commission regulation of power rates under the filed-rate doctrine. Entergy Louisiana shared capacity with its fellow operating companies in the Entergy System which allowed the companies "to access additional capacity when demand exceeds the supply generated by that company alone." *Entergy La.*, 539 U.S. at 42, 123 S. Ct. at 2053. Pursuant to MSS-1 of the System Agreement, the same ESA at issue here, Entergy allocated the costs of keeping excess capacity available among the operating companies. *Id.* MSS-1 provided a formula to calculate "cost-equalization" payments among the companies in the System, which ensured that companies within the System that used more capacity than they contributed ("short" companies) made payments to companies that contributed more capacity than they used ("long" companies). *Id.* at 42–43, 123 S. Ct. at 2053–54. Entergy determined each company's capacity on a monthly basis, and a company that contributed more

capacity than it used received a payment equal to its average cost of the company's generating units multiplied by the number of megawatts the company was considered "long." *Id.* at 43, 123 S. Ct. at 2054. Under Entergy's Extended Reserve Shutdown ("ERS") program, the operating committee could designate some generating units as not immediately necessary for capacity needs; but because these units could be activated if energy demand increased in the future, these units were considered "available" under the MSS-1's cost-equalization calculations. *Id.*

FERC approved an amendment to the System Agreement that "allow[ed] an ERS unit to be treated as available under MSS-1 if the operating committee determine[d] it intend[ed] to return the unit to service at a future date." *Id.* at 44, 123 S. Ct. at 2054. Entergy Louisiana, which routinely had to make cost-equalization payments to other companies within the System pursuant to MSS-1, filed its 1997 retail rates with the Louisiana Public Service Commission ("LPSC")—the counterpart to the Texas PUC in this case. *See id.* at 45, 123 S. Ct. at 2055. The LPSC determined that, although it *was* preempted from determining whether the operating committee's inclusion of ERS units prior to August 5, 1997—the date of the FERC order approving the amendment to the System Agreement—was prudent, it *was not* preempted from "disallowing MSS-1 related costs as imprudent subsequent to August 5, 1997." *Id.* The LPSC "concluded that

16

the operating committee's treatment of ERS units after August 5, 1997, was imprudent and that [Entergy Louisiana's] MSS-1 payments would not be considered when setting [its] retail rates in Louisiana." *Id.* at 46, 123 S. Ct. at 2055.

The United States Supreme Court determined that the LPSC's order "impermissibly 'traps' costs that have been allocated in a FERC tariff" in violation of the filed-rate doctrine. *Id.* at 49, 123 S. Ct. at 2057. The Court noted that the System Agreement "leaves the classification of ERS units to the discretion of the operating committee" instead of involving a specific FERC-mandated cost-allocation. *Id.* The Court refused to create an exception to the filed-rate doctrine, even though the case did not involve a specific FERC mandate, reasoning that to do so would "substantially limit FERC's flexibility in approving cost allocation arrangements." *Id.* at 50, 123 S. Ct. at 2057. The Court also held that preemption did not depend on the existence of a FERC order approving the particular classification at issue, stating, "It matters not whether FERC has spoken to the precise classification of ERS units, but only whether the FERC tariff dictates how and by whom that classification should be made." *Id.*

The same FERC-approved System Agreement that governed in *Entergy Louisiana* governs Entergy's operations in this case. ESA section 6.02 sets out the duties of the System Operating Center. This section provides that Entergy Services

17

shall "[d]etermine the most effective scheduling of sources for the reliable supply of power and energy on an economical basis to the companies" and "[d]etermine the availability of energy for purchase from or sale to outside systems on an economical basis under effective contracts and arrange for and schedule such transactions." The ESA thus allows the System Operator to meet energy demand by purchasing capacity from third-party sources, but the ESA does not specifically dictate the amount of power the System Operator is to purchase from third-party sources relative to system-generated power. This decision is therefore left to the System Operator's discretion under the FERC-approved ESA.

Jenkins challenges that decision, alleging that Entergy manipulated the computer programs used in making purchasing decisions, such that Entergy purchased more expensive system-generated power even though lower-cost third-party power was available, resulting in Entergy's charging higher rates to its retail customers. Jenkins seeks a refund of *retail* charges, but he complains about Entergy's *wholesale* electricity purchases. Although Jenkins does not allege breach of the ESA as a cause of action, he challenges Entergy's purchasing decisions—whether to use allegedly available third-party electricity or system-generated electricity—which Entergy undertook pursuant to the ESA. Determining whether Entergy permissibly exercised its discretion in making its

18

purchasing decisions thus necessarily requires consideration of the ESA, a FERC-approved tariff.

Because resolving this dispute involves the consideration and interpretation of a FERC-approved tariff, we conclude that this dispute falls within FERC's exclusive jurisdiction. *See AEP Tex. N. Co.*, 473 F.3d at 585 ("FERC, not the state, is the appropriate arbiter of any disputes involving a tariff's interpretation."); *see also Entergy La.*, 539 U.S. at 50, 123 S. Ct. at 2057 ("It matters not whether FERC has spoken to the precise classification of ERS units, but only whether the FERC tariff dictates how and by whom that classification should be made.").

Because Jenkins did not exhaust his administrative remedies by first bringing this dispute before FERC, we hold that the trial court lacks subject matter jurisdiction over the case. *See In re Entergy Corp.*, 142 S.W.3d at 321–22 (holding that when agency has exclusive jurisdiction over dispute, party must exhaust all administrative remedies before seeking relief in district court from agency decision, and until party exhausts administrative remedies, trial court lacks subject matter jurisdiction). We hold that the trial court erroneously denied Entergy's motion to dismiss for lack of jurisdiction and that the trial court's class-certification order is therefore void.

Accordingly, we sustain Entergy's first issue.[6]

## Conclusion

We declare the trial court's order granting class certification void. We reverse the order of the trial court denying Entergy's motion to dismiss and render judgment dismissing all claims against Entergy.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Justice Sharp, dissenting. Opinion to follow.

---

[6] Given our disposition of Entergy's first issue, we need not reach its second and third issues. *See* TEX. R. APP. P. 47.1.